

# COMMONWEALTH of VIRGINIA

POST OFFICE BOX 2452      *Secretary of the Commonwealth*      RICHMOND, VIRGINIA 23218-2452

## NOTICE OF SERVICE OF PROCESS

Cottman Transmissions Systems, LLC
201 Gibraltar Road
Horsham, PA  19044

**RECEIVED**

**MAY 0 2 2011**

**LAW DEPARTMENT**

James M. Dunlap

vs.

Cottman Transmissions Systems, LLC

**Summons and Complaint**

Dear Sir/Madam:

You are being served with the enclosed notice under section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process.

If you have any questions about this matter, PLEASE contact <u>the CLERK of the enclosed/below mentioned court</u> or any attorney of your choice. <u>Our office does not accept payments on behalf of debts.</u>  The Secretary of the Commonwealth's ONLY responsibility is to mail the enclosed papers to you.

COURT:
City of Chesapeake
Chesapeake Circuit Court
307 Albemarle Drive, Suite 300A
Chesapeake, VA 23322-5579
757 3823000

Service of Process Clerk
Secretary of the Commonwealth's Office

# AFFIDAVIT FOR SERVICE OF PROCESS ON THE SECRETARY OF THE COMMONWEALTH

Case No. ▓▓▓▓ CL 1000 034 00▓

Commonwealth of Virginia

▓▓▓▓▓▓ CHESAPEAKE ▓▓▓▓▓▓. Circuit Court

| ▓▓▓ JAMES M. DUNLAP ▓▓▓ | v. | ▓ COTTMAN TRANSMISSIONS SYSTEMS, LLC ▓ |
| ▓▓▓ 1112 DEBREE AVE ▓▓▓ | | ▓▓▓ 201 GIBRALTAR RD ▓▓▓ |
| ▓▓▓ NORFOLK, VA 23517 ▓ | | ▓▓▓ HORSHAM PA 19044 ▓▓ |

**TO THE PERSON PREPARING THIS AFFIDAVIT:** You must comply with the appropriate requirements listed on the back of this form.

Attachments:   ☒ Summons and Complaint          ☒ Notice
                                                  ▓▓▓▓▓▓▓▓▓▓▓

I, the undersigned Affiant, state under oath that
☒ the above-named defendant   ▓
   whose last known address is   ☒ same as above

1. ☒ is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) applies (see NON-RESIDENCE GROUNDS REQUIREMENT on reverse).

2. ☐ is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE REQUIREMENT ON BACK)

▓▓▓▓▓▓▓▓▓▓▓▓ is the hearing date and time on the attached process or notice.

_4/27/11_
DATE

☐ PARTY   ☒ PARTY'S ATTORNEY   ☒ PARTY'S AGENT   ☒ PARTY'S REGULAR AND *BONA FIDE* EMPLOYEE

State of _VA_     ☒ City ☐ County of _Richmond_

Acknowledged, subscribed and sworn to before me this day by _James M. Dunlap_
                                                        PRINT NAME OF SIGNATORY

_4-27-11_
DATE

☐ CLERK   ☒ MAGISTRATE   ☒ NOTARY PUBLIC
Notary Registration No. _7279055_   My commission expires: _10-31-2013_

☒ Verification of the date of filing of the certificate of compliance is requested and a self-addressed stamped envelope is provided.

**NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:**
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE THAT THE CERTIFICATE OF COMPLIANCE IS FILED WITH THE ABOVE-NAMED COURT.

## CERTIFICATE OF COMPLIANCE

I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:

1. On ..... **APR 2 7 2011** ....., legal service in the above-styled case was made upon the Secretary of the Commonwealth, as statutory agent for persons to be served in accordance with Section 8.01-329 of the Code of Virginia, as amended.

2. On ..... **APR 2 7 2011** ....., papers described in the Affidavit were forwarded by certified mail, return receipt requested, to the party designated to be served with process in the Affidavit.

SERVICE OF PROCESS CLERK, DESIGNATED
BY THE AUTHORITY OF THE SECRETARY OF THE COMMONWEALTH

FORM CC-1418 (MASTER, PAGE ONE OF TWO) 11/07
VA. CODE §§ 8.01-301, -310, -329; 55-218.1; 57-51

## NON-RESIDENCE GROUNDS REQUIREMENT:

If box number 1 is checked, insert the appropriate subsection number:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1.  Transacting any business in this Commonwealth;

2.  Contracting to supply services or things in this Commonwealth;

3.  Causing tortious injury by an act or omission in this Commonwealth;

4.  Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

5.  Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

6.  Having an interest in, using, or possessing real property in this Commonwealth;

7.  Contracting to insure any person, property, or risk located within this Commonwealth at the time of contracting; or

8(ii). Having been ordered to pay spousal support or child support pursuant to an order entered by any court of competent jurisdiction in this Commonwealth having *in personam* jurisdiction over such person.

## DUE DILIGENCE REQUIREMENT:

If box number 2 is checked, the following provision applies:

When the person to be served is a resident, the signature of an attorney, party or agent of the person seeking service on such affidavit shall constitute a certificate by him that process has been delivered to the sheriff or to a disinterested person as permitted by § 8.01-293 for execution and, if the sheriff or disinterested person was unable to execute such service, that the person seeking service has made a bona fide attempt to determine the actual place of abode or location of the person to be served.

# COMMONWEALTH OF VIRGINIA



CHESAPEAKE CIRCUIT COURT
Civil Division
307 ALBEMARLE DR. 300A
CHESAPEAKE  VA
(757) 382-3037

Summons

To: COTTMAN TRANSMISSIONS SYSTEMS          Case No. 550CL10001034-00
    201 GIBRALTAR ROAD
    HORSHAM PA 19044

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Monday, April 25, 2011

Clerk of Court: FAYE W. MITCHELL

by _____
                                (CLERK/DEPUTY CLERK)

Instructions:          ATTORNEY WILL PICK UP SERVICE AND FORWARD SAME TO SECY

Hearing Official:

Attorney's name:      DUNLAP, JAMES M



# COMMONWEALTH of VIRGINIA

POST OFFICE BOX 2452

## *Secretary of the Commonwealth*

RICHMOND, VIRGINIA 23218-2462

### NOTICE OF SERVICE OF PROCESS

Todd P. Leff
457 Notre Dame Drive
Warrington, PA  18976

James M. Dunlap

vs.

Todd P. Leff

**Summons and Complaint**

Dear Sir/Madam:

You are being served with the enclosed notice under section 8.01-329 of the Code of Virginia
which designates the Secretary of the Commonwealth as statutory agent for Service of Process.

If you have any questions about this matter, PLEASE contact the CLERK of the enclosed/below
mentioned court or any attorney of your choice. Our office does not accept payments on behalf
of debts. The Secretary of the Commonwealth's ONLY responsibility is to mail the enclosed
papers to you.

COURT:
City of Chesapeake
Chesapeake Circuit Court
307 Albemarle Drive, Suite 300A
Chesapeake, VA 23322-5579
757 3823000

Service of Process Clerk
Secretary of the Commonwealth's Office

# AFFIDAVIT FOR SERVICE OF PROCESS ON THE SECRETARY OF THE COMMONWEALTH

Case No. ▓▓▓▓▓

Commonwealth of Virginia

▓▓▓▓▓ Circuit Court

▓▓▓▓▓    v.    ▓▓▓▓▓

*Warrington*

TO THE PERSON PREPARING THIS AFFIDAVIT: You must comply with the appropriate requirements listed on the back of this form.

Attachments: ☒ Summons and Complaint    ☒ Notice

I, the undersigned Affiant, state under oath that

☒ the above-named defendant ▓▓▓▓▓

whose last known address is ☒ same as above ▓▓▓▓▓

1. ☒ is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) applies (see NON-RESIDENCE GROUNDS REQUIREMENT on reverse).

2. ☒ is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE REQUIREMENT ON BACK)

▓▓▓▓▓ is the hearing date and time on the attached process or notice.

4/27/11 DATE

☒ PARTY ☒ PARTY'S ATTORNEY ☒ PARTY'S AGENT ☒ PARTY'S REGULAR AND *BONA FIDE* EMPLOYEE

State of: *VA*

☒ City ☐ County of *Chesapeake and Richmond*

Acknowledged, subscribed and sworn to before me this day by *James M. Duly*

PRINT NAME OF SIGNATORY

4-27-11 DATE

*Pobook*

☐ CLERK ☐ MAGISTRATE ☒ NOTARY PUBLIC

Notary Registration No. *7270905S* My commission expires: *10-31-2013*

☒ Verification of the date of filing of the certificate of compliance is requested and a self-addressed stamped envelope is provided.

NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE THAT THE CERTIFICATE OF COMPLIANCE IS FILED WITH THE ABOVE-NAMED COURT.

## CERTIFICATE OF COMPLIANCE

I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:

1. On APR 2 7 2011 , legal service in the above-styled case was made upon the Secretary of the Commonwealth, as statutory agent for service in accordance with Section 8.01-329 of the Code of Virginia, as amended.

2. On APR 2 7 2011 , papers described in the Affidavit were forwarded by certified mail, return receipt requested, to the party designated to be served with process in the Affidavit.

SERVICE OF PROCESS CLERK, DESIGNATED
BY THE AUTHORITY OF THE SECRETARY OF THE COMMONWEALTH

FORM CC-1418 (MASTER, PAGE ONE OF TWO) 11/07
VA. CODE §§ 8.01-301, -310, -329; 55-218.1; 57-51

**NON-RESIDENCE GROUNDS REQUIREMENT:**

If box number 1 is checked, insert the appropriate subsection number:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1.   Transacting any business in this Commonwealth;

2.   Contracting to supply services or things in this Commonwealth;

3.   Causing tortious injury by an act or omission in this Commonwealth;

4.   Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

5.   Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

6.   Having an interest in, using, or possessing real property in this Commonwealth;

7.   Contracting to insure any person, property, or risk located within this Commonwealth at the time of contracting; or

8(ii). Having been ordered to pay spousal support or child support pursuant to an order entered by any court of competent jurisdiction in this Commonwealth having *in personam* jurisdiction over such person.

**DUE DILIGENCE REQUIREMENT:**

If box number 2 is checked, the following provision applies:

When the person to be served is a resident, the signature of an attorney, party or agent of the person seeking service on such affidavit shall constitute a certificate by him that process has been delivered to the sheriff or to a disinterested person as permitted by § 8.01-293 for execution and, if the sheriff or disinterested person was unable to execute such service, that the person seeking service has made a bona fide attempt to determine the actual place of abode or location of the person to be served.

# COMMONWEALTH OF VIRGINIA



### CHESAPEAKE CIRCUIT COURT
Civil Division
307 ALBEMARLE DR. 300A
CHESAPEAKE VA
(757) 382-3037

Summons

To: TODD P LEFF
457 NOTRE DAME ROAD
WASHINGTON PA 18976

Case No. 550CL10001034-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Monday, April 25, 2011

Clerk of Court: FAYE W. MITCHELL

by _____
(CLERK/DEPUTY CLERK )

Instructions:   ATTORNEY WILL PICK UP SERVICE AND FORWARD SAME TO SECY

Hearing Official:

Attorney's name:   DUNLAP, JAMES M

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF CHESAPEAKE

| | |
|---|---|
| JAMES M. DUNLAP )<br><br>    Plaintiff, )<br><br>    v. )<br><br>COTTMAN TRANSMISSIONS SYSTEMS )<br>, LLC )<br><br>Serve: Office of the Secretary )<br>   of the Commonwealth )<br>   1111 East Broad Street, 4th Floor )<br>   Richmond, Virginia 23219 )<br><br>and )<br><br>TODD P. LEFF )<br><br>Serve: Office of the Secretary )<br>   of the Commonwealth )<br>   1111 East Broad Street, 4th Floor )<br>   Richmond, Virginia 23219 )<br><br>    Defendants. )| Case No. *CL 1000 1034-00* |

## COMPLAINT

COMES NOW James M. Dunlap ("Dunlap") by counsel and as his Complaint against defendants Cottman Transmissions Systems LLC ("Cottman") and Todd P. Leff ("Leff") avers as follows:

1. Plaintiff, Dunlap, is a citizen of Virginia, residing at 1312 Debree Avenue, Norfolk, Virginia 23517.  Dunlap operates an AAMCO Transmission center located at 1330 South Military Highway. Chesapeake. Virginia 23320 and until March 2010, operated a similar AAMCO center at 4117 Portsmouth Boulevard, Portsmouth, Virginia 23701.

2.      Defendant Leff is a citizen of Pennsylvania, residing at 457 Notre Dame Drive, Warrington, Pennsylvania 18976.

3.      Defendant Cottman is a Delaware Limited Liability Company, with its principle place of business located at 201 Gibraltar Road, Horsham, Pennsylvania 19044. Through various franchisees, Cottman licenses numerous transmission repair facilities throughout the United States. Beginning in 1998, Leff became President of Cottman.

4.      On September 26, 1978, Dunlap entered into a franchise agreement with AAMCO Transmissions, Inc. ("AAMCO") pursuant to which he became the owner of the AAMCO transmission franchise located in Portsmouth, Virginia ("Portsmouth center"). As with Cottman, through its franchisees, AAMCO licenses numerous transmission repair facilities throughout the United States. Dunlap owned and operated the Portsmouth center for more than 30 years.

5.      In November 1993, the original franchise agreement for the Portsmouth center was renewed. The renewal was for a one-year period. The agreement, however, provided for successive one-year renewals, unless action to end the agreement was taken by the parties of the contract. This pattern of successive one-year contract renewals reflects a long-term relationship between Dunlap and AAMCO and gave Dunlap a reasonable expectation that the relationship would continue. Dunlap was notified by letter dated August 10, 2009, that the Portsmouth franchise agreement would expire on September 25, 2009. Ultimately, as a result of the actions alleged herein, Dunlap closed the Portsmouth center effective March 5, 2010.

6.      On June 5, 1981, Dunlap entered into a franchise agreement with AAMCO pursuant to which he became the owner of the AAMCO transmission center located in Chesapeake, Virginia ("Chesapeake center"). Dunlap has owned and operated the Chesapeake

center for more than 28 years.  This agreement was renewed in 1996 for a period of 15 years.

7.    Under the AAMCO system, the franchisees within the Tidewater, Virginia market have worked together and contributed to a local ad pool that places advertising to benefit dealers in the entire Tidewater market.  And it is the efforts of the local dealers that have created the recognition of the AAMCO name and trademark in that geographical area.  It is the financial contributions of long-surviving dealers, like Dunlap, that have created the value.  AAMCO does not provide funds nor does it make financial contributions to the advertising and promotions of the AAMCO trademark in the Tidewater, Virginia area.

8.    Participation in the local ad pool and the local advertising placed by that pool, both in telephone directories and other publications, is essential to the promotion of the AAMCO trade name, as well as the financial success of the AAMCO franchises in the Tidewater, Virginia area, including those owned by Dunlap.

9.    On or around March 31, 2004, American Capital and Strategies, Ltd., through a subsidiary, American Driveline Systems, Inc, ("ADS") acquired 78% of Cottman Transmission Systems, LLC on a fully diluted basis, giving them a controlling interest in that company. The acquisition involved senior and junior subordinated debt with warrants and redeemable preferred and common stock.  At the time, Leff was president of Cottman.  He subsequently also became President of ADS.

10.    On or about March 3, 2006, ADS acquired an 83% interest on a fully diluted basis in AAMCO.  This acquisition involved senior term loans, senior and junior subordinated debt, and preferred and common stock.

11.    Shortly thereafter Leff became president of AAMCO.

12.    ADS is a Delaware Corporation.  While ADS purchased controlling interests in

both Cottman and AAMCO, neither company became a wholly-owned subsidiary of ADS. At the time American Capital announced that ADS had purchased a controlling interest in AAMCO, it announced that management would have a significant equity interest in AAMCO as well.

13. Since the acquisition of an interest in AAMCO, both Cottman and AAMCO have remained separate, independent entities.

14. Subsequent to ADS' acquisition of its AAMCO stock, Cottman and AAMCO made a decision to begin a process of converting Cottman centers into AAMCO centers.

15. On March 8 or 9, 2006, a webinar was presented to the Cottman franchisees by Leff, during which he stated Cottman's intention to "migrate all Cottman Centers to the AAMCO brand over the next three years."

16. In addition, during the webinar, incentives to encourage the conversion to the AAMCO brand were offered. The benefits as stated included: (a) brand name with 90% awareness; (b) reduced franchise fees to 7%; (c) entry into the local AAMCO ad pool; (d) increased resale value of an AAMCO center versus a Cottman center; (e) participation in the AAMCO Fleet without a 1% surcharge currently being charged to Cottman dealers; (f) the ability to increase the average repair order – AAMCO centers averaged $200.00 higher on major repairs; (g) access to AAMCO's highly regarded technical department; and (h) participation in AAMCO's national buying discount programs.

17. The webinar cited a timeline of 60 days for Cottman to develop marketing plans, roll out the conversion package and publish a strategic plan for franchisees.

18. The intention to convert Cottman centers to the AAMCO brand over a three year period was also announced in a March 9, 2006, publication for AAMCO dealers entitled "Twin Post."

19.   On March 10, 2006, Mark Dimuzzio, Cottman's Vice President – Strategic Development, sent a memorandum to existing Cottman franchisees describing the steps necessary to convert to an AAMCO center. The letter made it clear that, to be eligible to convert, the Cottman franchisee could not be in material breach of the Cottman License Agreement.

20.   On March 16, 2006, Cottman franchisees received another offer to convert via fax.

21.   Upon information and belief, after ADS' acquisition of a controlling interest in AAMCO, representatives of Cottman and AAMCO, including Leff, agreed to take certain actions to terminate Dunlap's franchises in order to make the territories available to existing Cottman franchisees in the same locales. Both Cottman and AAMCO, through their representatives, knew and intended that the actions to be jointly undertaken would injure Dunlap's businesses.

22.   Both Cottman and Leff had financial incentives to aggressively pursue the conversion of Cottman centers into AAMCO centers. The financial records of Cottman and AAMCO reflect a "kick back" system in which royalties from the conversion centers were returned to Cottman. In addition, upon information and belief, Leff received additional compensation for each Cottman franchise that converted to an AAMCO center, providing a personal independent stake in the success of the conversion program.

23.   On or around March 10 and 16, 2006, Joseph Truskowski ("Truskowski"), owner of the Cottman franchise in Portsmouth, Virginia, near Dunlap's Portsmouth center, received correspondence from Dimuzzio, affording him the opportunity to amend his Cottman License Agreement and convert to an AAMCO franchise.

24. Truskowski's initial decision was to remain as a Cottman dealer. Prior to May 4, 2006, however, Truskowski received a telephone call from Dimuzzio. promising him he would be the sole AAMCO dealer in Portsmouth, Virginia, if he agreed to the conversion. Dimuzzio stated that Dunlap would be "gone." He further stated that would "he would squash him [Dunlap] like a bug."

25. In reliance upon the promise of an exclusive territory and the elimination of Dunlap, his largest competitor, Truskowski agreed to join Cottman's and AAMCO's efforts to injure Dunlap by signing a letter of intent to convert to an AAMCO center. As a former employee of Dunlap's, Truskowski was aware of the long-term relationship that existed between Dunlap and AAMCO.

26. In addition, prior to May 4, 2006, Truskowski announced to Dunlap's employees that AAMCO intended to terminate Dunlap's franchises and that AAMCO had promised Dunlap's zones to Truskowski and Robert Biller ("Biller"), the Cottman franchisee in Chesapeake, Virginia.

27. Also, prior to May 4. 2006, Dunlap made a personal visit to the Cottman Center at 111 Gainesboro Square in Chesapeake, Virginia, where he met Biller. Dunlap identified himself as the franchisee of the AAMCO center in Chesapeake, Virginia. During the ensuing conversation, Biller stated that he had investigated the AAMCO franchise before becoming a Cottman franchisee and that there were no AAMCO centers available in the market. He also stated that he considered Cottman to be a "second tier operation." Biller was fully aware of the AAMCO franchise system and the contractual relationships that existed in the market.

28. On May 4. 2006, Leff, Dimuzzio and Brian O'Donnell, AAMCO's Senior Vice President of Operations. chaired a meeting of AAMCO and Cottman dealers in Richmond,

Virginia. Among those in attendance, in addition to Dunlap, were Truskowski and Biller. The dealers in attendance were from throughout Virginia. All of the dealers from the Tidewater, Virginia market attended. During that meeting, Leff made the following statements: (a) the Cottman name would no longer be developed; (b) there would be a three year conversion plan to convert all Cottman centers to AAMCO centers; (c) the Tidewater market was deemed one of the most conflicted markets due to the close proximity of the existing dealers; and (d) the terms of the AAMCO marketing agreement would be honored. Based upon the marketing agreement, there were 12 centers allocated to the Tidewater market. With the combination of AAMCO and Cottman centers, there were 14 centers in existence in that market. Leff stated his intent to close two of those centers.

29.     Advertising in the local yellow pages is and has always been critical to the financial success of AAMCO centers. Such advertising is coordinated by the local ad pool in which all franchisees participate. At the time of the meeting in Richmond, the closing date for placement of the Verizon Yellow Pages ad in the Tidewater area was imminent.

<u>Initial Conversion Activities</u>

30.     After May 4, 2006, AAMCO proceeded to take action to convert the two Cottman centers in Chesapeake and Portsmouth, Virginia. AAMCO acquired and retained ownership of telephone numbers 757-436-1221 and 757-398-0200. These telephone numbers were listed in the Verizon White Pages in October 2006 as AAMCO Transmissions, Inc. telephone numbers and were ultimately assigned to Biller and Truskowski after they became AAMCO centers.

31.     On May 10, 2006, AAMCO and Cottman entered into a binding contract with Biller to amend his Cottman License Agreement and convert his Chesapeake, Virginia center to an AAMCO center. Under the terms of the amendment, except as modified, the Cottman

License Agreement would remain in effect.

32.     On May 16, 2006, AAMCO and Cottman entered into a binding contract with Truskowski to amend his Cottman License Agreement and convert his Portsmouth, Virginia center to an AAMCO center. Under the terms of the agreement, except as modified, the Cottman License Agreement would remain in effect.

33.     Under the terms of the amendments to the Cottman License Agreements signed by both Truskowski and Biller, before they could be accepted into the AAMCO system, both had to be "in complete compliance with all terms and conditions of the License Agreement." In particular, Cottman dealers were required to remain current with Cottman with respect to franchise fees. At the time Truskowski made the decision to convert, he was not current with his Cottman fees and thus was in material breach of his Cottman License Agreement.

34.     In addition, the Amendments signed by Biller and Truskowski required that the converting franchisees not place any new advertising using the Cottman name or marks without prior written authorization from Cottman. They also required each converting Cottman franchisee to remove all Cottman signs and replace them with AAMCO signage before acceptance into the AAMCO system.

35.     After May 16, 2006, Truskowski placed an order for new AAMCO signs.

36.     During May 2006, Truskowski showed a copy of the order for AAMCO signs to one of Dunlap's employees. He also showed that employee a check in the approximate amount of $10,000.00 which represented money he borrowed to pay Cottman, thus bringing him into compliance with his Cottman License Agreement, so as to be eligible for conversion to an AAMCO center.

<u>Dunlap's Termination</u>

37.    In furtherance of Leff's commitment to closing two Tidewater AAMCO centers stated at the Richmond meeting, on May 8, 2006, AAMCO notified Dunlap of alleged defaults under both of his franchise agreements ("Notice of Default"). The terms of the franchise agreements afford the franchisee 10 days to cure financial defaults and 30 days to cure administrative defaults.

38.    Between May 8 and June 8, 2006, Dunlap addressed the alleged defaults as set out by AAMCO in its May 8 letters:

(a)    Weekly Financial Reports. AAMCO alleged that Dunlap had failed to submit a number of weekly financial reports to the central office. Even though Dunlap's center manager, Robert Wynn, had submitted the reports in November 2005, the reports had never been recorded because of a lack of communication within AAMCO's Financial Services Department. In April or May of 2006, an AAMCO employee known only as Barbara acknowledged the presence of the reports.    At the time of the Notice of Default, the reports had been in the possession of AAMCO for over five months and AAMCO had never expressed any concerns over the substance of the submitted reports. Nevertheless, Dunlap resubmitted the reports on June 8, 2006. They were sent Priority Mail, return receipt requested.

(b)    Franchise Fees. The majority of fees AAMCO alleged were outstanding had been paid prior to March 8, 2006, but had not been properly credited to his accounts. For example, Dunlap had sent several payments in October 2005, but those payments had not been recorded by AAMCO. In December 2005, Dunlap sent copies of the cancelled checks to the current AAMCO counsel, Karen Von Dreusche. The letter from Dunlap. dated December 22, 2005. never received a response. On April 1, 2006. Dunlap sent a fax to Gerald Ferrier pointing out the failure of AAMCO to properly credit his accounts. As a result, the October 2005 check for the Chesapeake center was credited. As late as September 29, 2008, however, the October 2005 check for the Portsmouth center still had not been credited to Dunlap's account even though AAMCO had received the proceeds from the check in October 2005. Moreover, the monthly statements provided by AAMCO to Dunlap actually reflected credit balances as of June 8, 2006.

39.    Notwithstanding these efforts to cure, on June 9, 2006, AAMCO notified Dunlap

that both of his franchises had been terminated for failure to cure the alleged defaults. The items listed in the Notice of Termination were false and represented a pretext as AAMCO and Leff had already decided to terminate Dunlap's centers as evidenced by the contracts entered into with Truskowski and Biller. The Notice of Termination cited specific unpaid items that, in fact, had been paid by check in October 2005, and asserted that the financial reports had not been received. Receipts from the US Post Office indicate that the reports had been sent in a timely fashion.

40.     As part of the agreement between Cottman, AAMCO and Leff to eliminate Dunlap from the AAMCO system and injure his business, between June 21 and June 23, 2006, O'Donnell requested by phone that Dunlap and his counsel come to Horsham, PA. O'Donnell stated he thought he could work something out so that Dunlap could keep his Chesapeake franchise if Dunlap gave up his rights to the Portsmouth franchise. This unwarranted effort to negotiate and force Dunlap to abandon one of his centers was reflective of the desire of defendants and AAMCO to prefer Truskowski's interests over Dunlap's.

41.     During the period of July 4 - 7, 2006, Dunlap attended a meeting of the National AAMCO Dealers Association (NADA) in Colorado. O'Donnell was present at this meeting and requested Chris Florian, an AAMCO dealer from Norfolk, VA, to assist in negotiations with Dunlap. Through Florian, O'Donnell again offered to work something out if Dunlap would forfeit the rights to his Portsmouth location. Florian advised Dunlap of O'Donnell's offer. Florian declined further involvement.

42.     Based on Dunlap's refusal to forfeit the rights to his Portsmouth franchise, on behalf of AAMCO, O'Donnell initiated an unwarranted, punitive action by removing all listings for Dunlap's centers in the 2006-07 Verizon Yellow Pages directory for the Tidewater, Virginia

area that was to be published in October 2006.

43.     Despite the Notice of Termination dated June 9, 2006, Dunlap continued to operate both of his centers as AAMCO centers. He continued to receive AAMCO statements and notices of other pertinent information, technical advice and FOCUS software support. He continued to submit weekly financial reports and made payments to AAMCO, which were willingly accepted. Dunlap also continued to participate and support the local advertising pool. These actions continued until Dunlap requested and was denied technical assistance and FOCUS software support in November, 2006.

44.     Then, on January 18, 2007, AAMCO filed a trademark infringement suit against Dunlap in Montgomery County, Pennsylvania.

45.     On July 11, 2007, the suit was dismissed as settled with both of Dunlap's centers being restored as licensed AAMCO facilities.

## Final Conversion of the Cottman Centers

46.     On July 14, 2006, by letter from Nancy Brudo, Director of Marketing at AAMCO, the re-establishment of the Portsmouth and Chesapeake zones were announced to the AAMCO dealers. This notice was issued two months after Biller and Truskowski signed the conversion agreements. By this late notice to the dealers, AAMCO failed to honor the requirements of Section 6.1 of the AAMCO franchise agreements which states "AAMCO agrees that before AAMCO grants any additional franchise in the county or MSA/PMSA in which Franchisee is located, it will conduct a marketing study and receive input and comments from Franchisees." AAMCO provided no prior notice to other Tidewater, Virginia franchisees, and, in particular, Dunlap, of any intention to grant franchises to Biller or Truskowski.

47.     By letter dated November 7, 2006, the conversions of the two Cottman centers in the Tidewater market were announced by AAMCO. This announcement coincided with the publication of the 2006-2007 Verizon Yellow Pages which, as a result of AAMCO's actions, did not list Dunlap's centers. The conversion of the Cottman center in Chesapeake owned by Biller occurred on November 2, 2006, while the conversion of the Cottman center in Portsmouth owned by Truskowski occurred on November 3, 2006.

48.     At the time of his conversion to an AAMCO center in November 2006, Truskowski was approximately $30,000.00 in arrears to Cottman. That arrearage constituted a material breach of his Cottman License Agreement, and per the terms of his May 18, 2006, Amendment to that License Agreement, made him ineligible to convert his center to the AAMCO system.

49.     To facilitate the conversion, however, Cottman, AAMCO and Truskowski orchestrated a fraudulent scheme to satisfy this indebtedness. Under the scheme, AAMCO arranged to sell certain equipment to Priority Leasing, Inc. ("Priority") which in turn would lease it to Truskowski. On November 14, 2006, AAMCO issued an invoice to Priority Leasing listing the new equipment it was selling to Priority. The purchase price was $29,952.56. The invoice provided that AAMCO would ship the equipment directly to Truskowski. Upon information and belief, Priority Leasing paid AAMCO for the equipment.

50.     Truskowski entered into a lease with Priority dated November 8, 2006, under which he agreed to rent the equipment for 60 months at $724.52 per month. Truskowski certified that the equipment had been delivered and installed. Upon information and belief, the proceeds from the putative sale to Priority Leasing were used to pay Cottman sums it was owed by Truskowski thus, enabling his conversion to an AAMCO center to proceed.

51.     In reality, the entire transaction was a sham.  The equipment at issue was already owned by Truskowski and was over seven years old.  No new equipment was sold to Priority Leasing under the putative agreement.  It was, simply stated, a fraudulent scheme by Cottman, AAMCO and Truskowski to trick Priority Leasing into paying approximately $30,000.00 that AAMCO could transfer to Cottman to pay off Truskowski's prior indebtedness, thus allowing the conversion to proceed and injure Dunlap.

52.     As a result of the scheme, Truskowski was allowed to convert to an AAMCO center that depressed the sales and profitability of Dunlap's Portsmouth center.

53.     In the November, 2006, edition of "The Shopper", Volume XI, Issue XI, Part II, River Walk/Western Greenbrier edition, Biller announced that "his center would be the only AAMCO center in Chesapeake, VA".

### Co-branding

54.     The amended License Agreements with Cottman and AAMCO signed by Biller and Truskowski specifically required the removal of all Cottman signage before becoming a recognized AAMCO center to avoid co-branding of AAMCO and Cottman.  Notwithstanding this requirement, Biller violated the terms of his amended License Agreement and continued to display the Cottman sign, in addition to the AAMCO sign at his Chesapeake center.  The sign was not removed until May 2008, over 18 months after Biller converted to an AAMCO center. The use of the Cottman signage by an AAMCO dealer with the acquiescence and/or consent of Cottman and AAMCO caused injury to Dunlap's center.  This inaction by defendants and AAMCO is further evidence of their concerted action to injure Dunlap's business.

55.     In addition, Biller continues to maintain and receive customer contacts on the telephone number 757-548-5578, which is the number associated with Cottman Transmissions in

Chesapeake, VA. And Biller has continued to advertise the Cottman telephone number in local newspapers. The use and benefit of a Cottman telephone number by an AAMCO dealer, in addition to an AAMCO telephone number with the full knowledge of the defendants and AAMCO, provides an unfair advantage to Biller and has caused and continues to cause Dunlap to lose customers, revenue and profits. It is demonstrative of the concerted actions of the defendants and AAMCO in preferring Biller over Dunlap and in creating or sanctioning actions the defendants know will injure Dunlap's business.

56.     Even after Dunlap's centers were restored as approved AAMCO centers in June 2007, AAMCO refused to allow Dunlap to be associated with the AAMCO telephone number listed in the Verizon Yellow Pages published in 2006-2007. The listing for the Chesapeake market read, "Call for Directions". The use of a splitter could have provided Dunlap an equal presence in the Verizon Yellow Pages. Yet AAMCO refused Dunlap's request to employ such a device thereby continuing to freeze Dunlap out of the Chesapeake market.

57.     On March 10, 2008, O'Donnell presented himself at Dunlap's Chesapeake AAMCO center. This meeting was unannounced. It afforded Dunlap the opportunity to deliver documents and photographs related to Biller's AAMCO center to O'Donnell, a member of the upper levels of AAMCO management. The following items were provided to O'Donnell:

      (a)     Photograph of the Woodford Square Auto Care Center marquee, which simultaneously displayed a Cottman and an AAMCO sign. This sign is located at the entrance of 111 Gainsborough Square, Chesapeake, VA, Biller's AAMCO center;

      (b)     Copies of yellow page advertisements in which Dunlap's Chesapeake AAMCO franchise was listed as a Norfolk location. This implies that the only AAMCO center in Chesapeake was Biller's center; and

      (c)     Copies of yellow page advertisements in which Biller continued to be associated with the Cottman franchise.

58.    Even after being presented with that information, O'Donnell and AAMCO took no action. Biller continues to benefit from the operation of a co-branded center and the Internet continues to list Biller's center both as a Cottman center and as an AAMCO center. Faxes sent to Jack Bachinsky, Vice President of Marketing at AAMCO, demonstrating the continued associations of the conversion center with Cottman Internet advertising have gone unanswered.

59.    Biller has unjustly benefited from the confusing use of two trademarks. The defendants and AAMCO have allowed Biller to breach the terms of the amended License Agreement and have failed to protect Dunlap's rights as well as those of other Cottman and AAMCO franchisees in the Tidewater, Virginia market.

60.    In addition, to this day the 411 Directory Assistance for Chesapeake, Virginia, directs customers who request information relating to Cottman centers to Biller's location at 111 Gainsborough Square. This location became an AAMCO center as of November 2, 2006.

61.    And, the location at 111 Gainsborough Square was listed in the 2008-09 South Hampton Roads Yellow Book as a Cottman Center.

62.    Like AAMCO, Cottman has refused to take the steps necessary to alleviate the issue. It has refused to terminate the Cottman phone number. Thus, Biller continues to retain the benefit of two phone numbers both for the Cottman and AAMCO centers all to the detriment of Dunlap.

63.    From November 3, 2006, until July 2, 2007, the Portsmouth center owned by Truskowski continued to benefit from the display of both Cottman and AAMCO signs. During this period, Truskowski also benefited from both the AAMCO telephone number 757-398-0200 and Cottman telephone number 757-397-7900. Despite repeated complaints from Dunlap, AAMCO did nothing to stop the co-branding or cause the Cottman telephone numbers to be

disconnected.

64.     As of July 2, 2007, Truskowski's Portsmouth AAMCO location was terminated. AAMCO directed all calls for telephone number 757-398-0200 to be forwarded to Dunlap's Portsmouth location. However, Truskowski continued to receive telephone calls on the Cottman telephone number 757-397-7900 and provide repair service until August 2008.

65.     On August 7, 2007, a senior AAMCO official was questioned as to the status of Truskowski's center and his continued use of the Cottman phone number. In response, AAMCO took no action to protect the AAMCO trademarks. This lack of action was detrimental to Dunlap's center. Upon information and belief, Truskowski was indebted to AAMCO at the time of his center's termination, and the defendants allowed Truskowski to continue to use the Cottman telephone number in hopes that he would continue to repay AAMCO.

66.     The defendants have acted in bad faith by failing to enforce the terms of its franchise agreements, thus making it impossible for Dunlap to restore his business to its previous levels of performance and to be able to sell his centers for a fair value.

67.     The defendants' actions to decrease the value of Dunlap's centers in order to force the sale of the centers at a depressed value constitutes "churning".

68.     Upon information and belief, by their actions, the defendants intended to eliminate Dunlap from the franchise which he has supported for over thirty years and to provide Biller with an exclusive territory in the Chesapeake market.

69.     Upon information and belief, by their action, the defendants intended to force the closure of the Portsmouth franchise, which occurred in March, 2010, so that it may be resold by AAMCO as a new franchise with the associated new fee structure.

70.     For many years, O'Donnell has harbored a personal animosity towards Dunlap.

The influx of new management in March 2006 at AAMCO, afforded O'Donnell an opportunity to eliminate his adversary.

71.    Most recently. during a discussion with an AAMCO employee. O'Donnell used the phrase "one down one to go" when the closing of Dunlap's Portsmouth franchise was mentioned.

72.    As a direct result of the actions taken by Cottman. Leff. AAMCO. Truskowski and Biller, including the conversions of Biller's and Truskowski's Cottman centers into AAMCO centers, the co-branding that was allowed, the removal of Dunlap's centers from the Verizon Yellow Pages and other actions, Dunlap has been damaged in that revenue to both his centers declined, thus depressing profits and reducing the value of his centers for resale purposes. Ultimately, Dunlap closed the Portsmouth center because of lack of profitability.

## COUNT I

## Violation of the Virginia Business Conspiracy Statute

73.    The allegations contained in paragraphs 1 through 72 are realleged and incorporated herein by reference.

74.    The defendants along with AAMCO, Truskowski and Biller conspired with each other to injure Dunlap in his businesses by. *inter alia*:

(a)    Agreeing with each other that, after the acquisition of a controlling interest in AAMCO, the opportunity existed to terminate Dunlap's franchises and make those territories available to Biller and Truskowski:

(b)    Participating in a persistent course of conduct whereby AAMCO falsely accused Dunlap of being in default of his franchise agreements, thereby creating the opportunity to bar his participation in Verizon Yellow Pages advertising for 2006-07 with the knowledge that the

action would injure his business;

(c)     Once Dunlap's franchises were restored as licensed AAMCO facilities in July, 2007, refusing to utilize a telephone call splitter so that Dunlap's could receive half of the calls to the AAMCO centers in the Chesapeake, Virginia market, thereby ensuring that Dunlap's Chesapeake center's business would be injured;

(d)     Developing and implementing a fraudulent scheme whereby Truskowski obtained sufficient moneys to repay his debt to Cottman and become eligible to convert an AAMCO center;

(e)     Allowing Biller and Truskowski to display Cottman signs, advertise as Cottman centers and continue to use Cottman telephone numbers and thus co-brand their centers as affiliated with both Cottman and AAMCO; and

(f)     Refusing to take any action to eliminate the co-branding actions with the knowledge that their inaction would provide competitive advantages to Biller and Truskowski and injure Dunlap's business.

75.     The defendants, AAMCO, Biller and Truskowski knew that if they continued the actions set out above, Dunlap's centers would be irreparably damaged.

76.     Cottman, Leff, AAMCO, Biller and Truskowski conspired with each other, agreeing to and participating in the actions set out above and financially benefitting from those actions all to the detriment of Dunlap.

77.     All of the defendants, along with AAMCO, Biller and Truskowski intentionally, purposefully and without legal justification conspired, agreed and mutually undertook the actions set out herein, thereby willfully and maliciously injuring Dunlap's businesses in violation of §§ 18.2-499 and 500 of the *Code of Virginia*.

78.     As a direct and proximate result of these actions, Dunlap has been injured and continues to suffer irreparable financial injury and other harm.

## COUNT II

### Tortious Interference with Contract

79.     These allegations set forth in paragraphs 1 through 72 are realleged and incorporated herein by reference.

80.     A valid binding contractual relationship existed between Dunlap and AAMCO with respect to both the Chesapeake and Portsmouth centers.

81.     Cottman and Leff were aware of that contractual relationship.

82.     Cottman and Leff took actions that included, *inter alia*:

(a)     Working with AAMCO to falsely declare Dunlap in default of his franchise agreements, thereby making his territories exclusively available to Biller and Truskowski;

(b)     Allowing and/or facilitating Biller and Truskowski to co-brand their centers and thereby gain an unfair competitive advantage to the detriment of Dunlap;

(c)     Working with AAMCO to remove Dunlap's centers from the 2006-07 Verizon Yellow Pages directory of the Tidewater, Virginia market and refusing to use a telephone call splitter to allow Dunlap to receive an equal number of telephone calls from the generic Chesapeake AAMCO telephone number; and

(d)     Participating in the development and/or implementation of a fraudulent scheme whereby Truskowski obtained money used to repay financial obligations to Cottman thereby becoming eligible to convert to an AAMCO center.

83.     In taking these actions the defendants knew that: (1) their conduct would interfere with the contractual relationship between AAMCO and Dunlap; (2) they could potentially

destroy Dunlap's businesses; and (3) damages to Dunlap were a certainty if their efforts were successful.

84.    The defendants' conduct was unjustified, without privilege and was specifically designed to interfere with the contractual relations between AAMCO and Dunlap and to cause Dunlap to incur significant damage.

85.    The actions of the defendants were intentional, willful, wanton and/or malicious and all were taken, upon information and belief, for the benefit of Cottman, Leff, Biller and Truskowski.

86.    As a direct and proximate result, Dunlap has been damaged.

## COUNT III

### Tortious Interference With Business Expectancy

87.    The allegations set forth in paragraphs 1 through 72 are realleged and incorporated herein by reference.

88.    The defendants know that the successes of Dunlap's franchises were dependant upon participation in the advertising pool and promptly answering telephone calls to his centers. They also knew that actions that would interfere with the number of telephone calls that came into Dunlap's centers would injure his businesses.

89.    Since 2006, the defendants have participated in activities that blocked Dunlap's centers from being represented in (1) advertising placed by the local ad pool and (2) the 2006-07 Verizon Yellow Pages. Those actions, as well as the refusal to allow Dunlap to benefit from the use of a telephone call splitter after July 2007, for the Chesapeake market, have injured Dunlap by suppressing the number of calls his centers received and, correspondingly, the number of

customers who used his centers.

90.     In addition, the defendants helped orchestrate the co-branding by both Biller and Truskowski that also negatively impacted Dunlap's potential customers.  And, they refused to take action to stop the co-branding from occurring.

91.     Finally, the defendants acted at all times to prefer the interests of Biller and Truskowski and repeatedly took steps that harmed Dunlap's business interests including, but not limited to, acting in concert with AAMCO to declare Dunlap in default of his franchise agreements, thus making the Portsmouth and Chesapeake zones available to Biller and Truskowski on an exclusive basis.

92.     It is at least reasonably probably that had the defendants not taken these actions, Dunlap's centers would have serviced a larger volume of customers and been more profitable.

93.     The defendants' actions as set out above were intentional, willful, wanton and/or malicious.

94.     As a direct and proximate result of the defendants' actions, Dunlap has been damaged.

WHEREFORE, Dunlap requests that this Court enter judgment in his favor against the defendants, jointly and severally, granting specifically the following relief:

**Count I:**     Judgment for $1.2 million or three-fold the amount of damages as proven at trial, plus costs, pre-judgment interest, attorneys' fees incurred herein, and such other relief as the Court deems appropriate.

**Count II:**     Judgment for $1.2 million or such amount as proven at trial, punitive damages in the amount of $350,000, plus costs, pre-judgment interest, and such other relief as the Court deems appropriate.

**Count III:**    Judgment for $1.2 million or such amount as proven at trial, punitive damages in the amount of $350,000, plus costs, pre-judgment interest, and such other relief as the Court deems appropriate.

JAMES M. DUNLAP

_____