IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| JAMES M. DUNLAP        ) | |
| )  | |
| Plaintiff,        )  | Civil Action No. 2:11-cv-272-AWA- |
| )  | DEM |
| v.        )  | |
| )  | |
| COTTMAN TRANSMISSIONS, LLC        )  | |
| )  | |
| and        )  | |
| )  | |
| TODD P. LEFF        )  | |
| )  | |
| Defendants.        )  | |
| )  | |

## PLAINTIFF JAMES M. DUNLAP'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

There are three issues before this Court:

1.    Where the defendants, through concerted action with third parties, tortiously interfered with plaintiff's Franchise Agreement with AAMCO Transmissions, Inc. and plaintiff's business expectancies, thereby causing lost profits and the ultimate collapse of one of plaintiff's AAMCO Transmission franchises, did they participate in unlawful acts sufficient to support a statutory conspiracy claim under Sections 18.2 – 499 and 500 of the *Code of Virginia*?

2.    Where plaintiff's claims for tortious interference with contract and business expectancy arise out of facts occurring on or after May 4, 2006, is this action, that was originally filed in the Circuit Court for City of Chesapeake on April 29, 2010, timely?

3.    Does this Court have personal jurisdiction over defendant, Todd P. Leff, who: (1) as president both of Cottman Transmission Services, Inc. and AAMCO Transmissions, Inc.; (2) in a meeting of Cottman and AAMCO franchisees on May 4, 2006, in Richmond, Virginia,

announced that certain AAMCO franchises in Tidewater, Virginia, would have to be terminated to make way for the conversion of Cottman franchises into AAMCO centers; and (3) through a conspiracy with others pursued a course of conduct that tortiously interfered with plaintiff's AAMCO franchises' profitability, while personally profiting from the conversion activities.

## FACTS

Plaintiff James Dunlap has operated AAMCO Transmission centers in Portsmouth and Chesapeake, Virginia, since 1978 and 1981, respectively. (Compl. ¶¶ 4, 6). For reasons which follow, the Portsmouth center closed in 2010. (Compl. ¶ 69).

Beginning in May 2006, as detailed below, defendants Cottman Transmission Services, Inc. ("Cottman") and Todd Leff ("Leff") participated in concerted activity with others designed to interfere with the operations of Dunlap's centers and suppressed their profitability to a point where Dunlap was forced to close the Portsmouth center. They did this in a conspiracy with AAMCO Transmissions, Inc. ("AAMCO"), Joseph Truskowski ("Truskowski"), and Robert Biller ("Biller"), two Cottman dealers in Portsmouth and Chesapeake, Virginia. (Compl. ¶¶ 23, 26, 74).

As alleged, in 2004, American Capital and Strategies, Ltd., through a subsidiary, American Driveline Systems, Inc. ("ADS"), purchased a controlling interest in Cottman. (Compl. ¶ 9). In 2006, it purchased a controlling interest in Cottman's chief competitor, AAMCO. (Compl. ¶ 10). Leff had been President of Cottman. Upon the acquisition of a controlling interest in AAMCO, he also became President of AAMCO as well as ADS. (Compl. ¶¶ 9, 11).

As part of the acquisition of AAMCO, ADS, Cottman and AAMCO adopted a conversion program whereby Cottman centers would be converted into AAMCO centers over a period of time. (Compl. ¶ 14). As alleged for each Cottman center that was converted, AAMCO

paid a kickback to Cottman of royalties from the conversion centers and Leff also received additional compensation for each center converted. (Compl. ¶ 22). Thus Leff had a personal stake in the success of the conversion program. (*Id.*).

One of the conditions of converting from a Cottman to an AAMCO center was that the Cottman dealer not be in material breach of the Cottman License Agreement, including being current with respect to franchise fees. (Compl. ¶¶ 19, 33).

Prior to May 4, 2006, Mark Dimuzzio, Cottman's Vice-President for Strategic Development, promised Truskowski that if he converted his center, Cottman would assure him that Dunlap's Portsmouth center would close and that Truskowski would have the exclusive territory then being served by Dunlap. (Compl. ¶ 24). Dimuzzio stated that "he would squash him [Dunlap] like a bug." (*Id.*). As of May 2006, Truskowski owed Cottman $10,000.00. (Compl. ¶ 36). By the time of the conversion of his center, Truskowski owed Cottman $30,000.00. Thus, he was not eligible to convert his center into an AAMCO center. (*Id.*).

To facilitate the conversion of Truskowski's center however, and given his indebtedness to Cottman, a fraudulent scheme was devised by AAMCO and Cottman whereby AAMCO would sell certain equipment to Priority Leasing, Inc. ("Priority") which would lease it to Truskowski. AAMCO invoiced Priority $29,952.56 for the equipment which was to be shipped directly to Truskowski. (Compl. ¶ 49). Upon information and belief, Priority paid AAMCO and that money was given to Cottman to satisfy Truskowski's indebtedness and make him eligible to convert his center. (Compl. ¶¶ 49, 50). In reality, however, there was no equipment to be purchased, and nothing was shipped to Truskowski. This was nothing more than a sham transaction designed to create the appearance that Truskowski was in compliance with his

contractual obligations to Cottman and therefore eligible to convert to an AAMCO center. (Compl. ¶ 51)

On May 4, 2006, Leff and Dimuzzio, along with others, convened a meeting with Cottman and AAMCO dealers in Richmond, Virginia.  During that meeting, the Cottman conversion program was discussed and at the end, Leff announced that the Tidewater, Virginia, market was too saturated to support all Cottman and AAMCO dealers and therefore a decision had been made that two AAMCO dealers would have to close. (Compl. ¶ 28).

Four days later, Dunlap received written notice from AAMCO falsely accusing him of being in default. (Compl. ¶ 37).  Notwithstanding Dunlap's efforts to cure the putative default, on June 9, 2006, AAMCO notified Dunlap that both of his franchises had been terminated. (Compl. ¶ 39).  The items listed in the notice of termination were a pretext, given that AAMCO had already entered into conversion agreements with Biller and Truskowski. (*Id.*)

Then, during late June and July AAMCO tried to pressure Dunlap to abandon his Portsmouth center so that Truskowski would have the exclusive territory in return for being reinstated in Chesapeake. (Compl. ¶¶ 40, 41).  Based upon Dunlap's refusal, AAMCO then removed Dunlap's listings from the Tidewater, Virginia, Verizon Yellow Pages. (Compl. ¶ 42).  At the same time it listed two numbers later assigned to Truskowski and Biller even though at the time their conversions had not occurred. (Compl. ¶¶ 30, 47).

Dunlap continued to operate his centers after the June 2006 notice and paid the franchise fees as required by his AAMCO agreements. (Compl ¶ 43).  Litigation brought by AAMCO in 2007 was settled with the agreement that both of Dunlap's franchises would be reinstated. (Compl ¶¶ 44-45).

As part of the conspiracy as alleged, Cottman, Leff and AAMCO took other steps that preferred the interests of Truskowski and Biller over those of Dunlap.   In particular, both Truskowski and Biller were allowed to co-brand their centers for a number of years after their conversion even though the Amended License Agreements with Cottman and AAMCO required the removal of all Cottman signs before conversion. (Compl. ¶ 54).   That is, they were allowed to display both Cottman and AAMCO signs and they continued to advertise their Cottman phone number, all to the detriment of Dunlap (Compl. ¶ 55).   Indeed, by allowing the co-branding, Cottman and Leff and the other co-conspirators created a situation where an unfair advantage was provided to Truskowski and Biller that materially harmed Dunlap's operations.   This co-branding of Truskowski's center continued until 2007 when he closed his franchise. (Compl. ¶ 63).   Biller did not remove the Cottman sign until May 2008, and as of the date the suit was filed, he continued to advertise the Cottman phone number. (Compl. ¶¶ 54-55).

In addition, after Dunlap's franchises were restored in 2007, AAMCO refused to use a telephone splitter to route any of the calls to a Chesapeake number listed in the Yellow Pages that informed callers to "call for directions." (Compl. ¶ 56).   The failure to do so sent all calls to Biller's location, thus further preferring his interests and harming Dunlap's.   Moreover, when Dunlap complained about the co-branding of Biller's and Truskowski's centers and furnished evidence of the same, neither Cottman nor AAMCO took any steps to rectify the situation. (Compl. ¶¶ 57-65).   The co-branding was in plain violation of AAMCO's franchise agreement with both Truskowski and Biller. (Compl. ¶ 34).

Ultimately, as a result of these activities on the part of Cottman and Leff along with their co-conspirators, Dunlap's profitability was affected so adversely that he was left with no alternative but to close the Portsmouth center. (Compl. ¶ 72).

## ARGUMENT

I.   **The Complaint States a Legal Claim for Statutory Business Conspiracy under Sections 18.2-499 and 500 of the *Code of Virginia.***

In an attempt to obtain dismissal of Dunlap's statutory conspiracy count, defendants seek to re-cast this Complaint as one alleging conspiracy to breach a contract, relying upon the Virginia Supreme Court's recent opinion in *Station No. 2, LLC v. Lynch*, 280 Va. 160, 295 S.E. 2d 537 (2010).   That effort must fail.   This case is not about a conspiracy to breach a contract. Indeed, neither defendant is a party to Dunlap's franchise agreement with AAMCO.   Rather, the defendants are alleged to have participated in a series of concerted actions that tortiously interfered with Dunlap's contract with AAMCO, as well as his business expectancy with potential customers.

Defendants are correct that the Supreme Court in *Station No. 2, LLC* made it clear that, without more, a breach of contract does not constitute an unlawful act for purposes of the business conspiracy statute. *Id.* at 541.   In that case, the plaintiff was a party to contracts with both defendants that contained a similar requirement, that he be permitted or required to soundproof the building between his restaurant on the 1st floor and proposed condominiums on the 2nd and 3rd.   As alleged, the defendants took actions that precluded the plaintiff from being able to satisfy those contractual conditions.   Nothing of the sort is at issue in this case.

Here, Dunlap operated AAMCO centers in Portsmouth and Chesapeake, Virginia.   On May 4, 2006, in a meeting in Richmond, Virginia, Leff announced that with the conversions of Cottman centers into AAMCO centers, the Tidewater, Virginia, metropolitan area could not support all of the existing centers, and two would be required to close.   Four days later, in furtherance of Leff's commitment to terminate two AAMCO dealers, Dunlap was notified that

his franchises were in default of the franchise agreements.  One month later he was notified they were being terminated.  Dunlap alleges that, the defendants: (1) conspired to terminate his franchises and make those territories available to Truskowski and Biller, two Cottman franchisees; (2) participated in a course of conduct, whereby AAMCO falsely accused Dunlap of being in default of his franchise agreement, creating the opportunity to bar his participation in the Verizon Yellow Pages for 2006-07, with the knowledge that such action would injure Dunlap's business; (3) developed and implemented a fraudulent scheme whereby Truskowski obtained sufficient monies to repay his debt to Cottman, and become eligible to convert to an AAMCO center; (4) allowed Biller and Truskowski to display Cottman signs advertising as Cottman centers and continue to use and advertise Cottman telephone numbers, thus, co-branding their centers as affiliated with both Cottman and AAMCO, all of which was known to injure Dunlap's business; and (5) refused to take any action to eliminate those co-branding actions, with the knowledge that such inaction would provide a competitive advantage to Biller and Truskowski and injure Dunlap's business.  All of these actions and others detailed in the Complaint interfered with Dunlap's contract with AAMCO, as well as his ability to attract customers to his Portsmouth and Chesapeake centers,  all the while favoring Biller and Truskowski's Cottman centers and further enriching Leff.

The Supreme Court has recognized that tortious interference with contract can serve as an "unlawful act" or "unlawful purpose" within the framework of Virginia's business conspiracy statute.  *Advanced Marine Enterprises v. PRC, Inc.*, 256 Va. 106, 112, 501 S.E.2d 148, 151 (1998).

Here the defendants' violation of their common law duties not to interfere with Dunlap's contract with AAMCO or his prospective economic advantage with other potential customers

meets that requirement and supports the claim for business conspiracy under the *Code of Virginia*.

## II.   A Five Year Statute of Limitations Applies to Counts II and III Alleging Tortious Interference with Contract and Business Expectancy.

Contrary to defendant's argument, in Virginia, claims for tortious interference with contract as well as tortious interference with business expectancy are subject to the 5 year statute of limitations, applicable to injury to property.  Section 8.01-243(B), *Code of Virginia.*.  Indeed, numerous cases, both in Virginia state and federal courts support the application of a 5 year limitations period.  In *Blueboy, Inc. vs Zomba Recording, LLC,* 2009 U.S. Dist. LEXIS 84988 (E.D.Va. Sept 16, 2009), Judge Hudson noted:

> This Court…agrees with other federal courts that have considered this question and have concluded that a claim of tortious interference of contract is an injury to property that is governed by Virginia's 5 year statute of limitations. *Va. Code Ann.*, § 8.01-243(A)(2009); *see Williams v. Reynolds*, No. 4:06cv00020, 2006 US. Dist. LEXIS 79178, at *15 (W.D.Va. Oct. 31, 2006); *Welch vs Kennedy Piggly Wiggly Stores, Inc.*, 63 B.R. 888, 898 (Bankr. E.D.Va. 1986); *see also Handley*, 32 Va. Cir. at 545.

*Id.* at *8.

And as recently as last year, this Court held that claims for tortious interference with contract "constitute[] injury to property governed by Virginia's 5 year statute of limitations." *Amr v. Moore*, 2010 U.S. Dist. LEXIS 79953, at *23 (E.D.Va., June 21, 2010) (collecting cases). Other Virginia courts have concluded likewise.  In *William v. Reynolds*, 2006 U.S. Dist. LEXIS 79178 (W.D.Va., Oct. 31 2006), the Court flatly rejected any contention that a 2 year statute of limitations applies to a claim for tortious interference under Virginia law.   Instead, the court, citing numerous cases, concluded that "Virginia courts view contracts or business expectancy as property rights, thereby granting a 5 year statute of limitations on the tortious interference

claim," also noting that "Virginia Courts have consistently applied a 5 year statute of limitations to tortious interference claims." *Id.* at *15-16. See also, *Mid-Atlantic TelCom, Inc. v. Long Distance Servs.*, 32 Va. Cir. 75, 78 (1993) (concluding that, "a 5 year period of limitations applies to actions for tortious interference with contractual relations under Virginia law"); *Lavery v. Automation Management Consultants, Inc.*, 234 Va. 145, 152, 360 S.E.2d 336, 341 (1987) ("the right to performance of a contract and the right to reap profits therefrom are property rights, which are entitled to protection in the courts."); *Worrie v. Boze*, 198 Va. 533, 536-37, 95 S.E.2d 192, 196 (1956) (interpreting the predecessor statute of limitations of Virginia with respect to a business conspiracy claim and holding that "it is well settled that the right to performance of a contract and the right to reap profits therefrom are property rights, which are entitled to protection in the courts.").

Defendants' reliance upon *Unlimited Screw Prods, Inc. v. Malm*, 781 F. Supp. 1121, 1127 (E.D.Va. 1991) is misplaced. In that case, Judge Smith concluded that a claim of tortious interference with a business expectancy was directed toward the corporate person and thus, subject to the 2 year statute of limitations. That case, however, relied upon cases that did not counsel the conclusion the Court reached. In *Brown v. American Broadcasting Company, Inc.*, 704 F.2d 1296, 1303-04 (4th Cir. 1983), an insurance salesperson claimed that the defendants caused injury to his personal reputation, which in turned damaged his business. The Fourth Circuit rejected such a claim as damage to property, finding that the principal damage was to his reputation. The Court also relied on *Pigott v. Moran*, 231 Va. 76, 81, 341 S.E.2d 179, 182 (1986), in which a homeowner sued a real estate agent contending that the agent told the buyer that the property adjacent to that purchased by the buyer was zoned residential, when in fact, it was zoned for commercial use. The plaintiff claimed the loss of quiet enjoyment and a reduction

in property value.  The *Pigott* court, however, concluded that "the gist" of the plaintiff's constructive fraud claim was injury to a person, despite the fact that the fraud caused a devaluation of the property.  Specifically, the court held that the plaintiff sought recovery of the value he paid for the property, which amounted to an injury to his person and not to the property. As a result, the *Pigott* court applied the 2 year statute of limitations to the constructive fraud claim.  *Id.*

Here, Dunlap does not claim an injury to his personal reputation, nor any other type of injury to his person.  Rather, his claim is that as a result of the tortious activities of the defendants, AAMCO breached the terms of the franchise agreement with Dunlap and sales were suppressed at his Portsmouth and Chesapeake locations, thereby reducing the profitability of his business and ultimately causing him to close the Portsmouth location.  These are plainly injuries to Dunlap's business, not to his person.  Accordingly, consistent with the cases cited, *supra*, the 5 year statute of limitations should apply.

All of the factual allegations in the Complaint as to activities alleged to have interfered with Dunlap's franchise agreement with AAMCO, as well as his relationship with potential customers, arose after May of 2006.[1]  This action was filed on April 29, 2010, well within the 5 year period.  Dunlap has alleged numerous actions that took place over the period of time between 2006-2010, when he closed his Portsmouth center.  Even were the court to apply a two year limitations period, claims based upon any actions by the defendants that caused injury after April 28, 2008, would be timely.

---

[1] Indeed, Biller and Traskowski did not open their AAMCO centers until November, 2006.

### III.   This Court Has Personal Jurisdiction over Defendant Todd P. Leff.

Preliminarily, when considering a Motion to Dismiss for lack of personal jurisdiction, the burden is on the plaintiff to prove by a preponderance of the evidence that the jurisdictional prerequisites have been satisfied. *Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993).   In the absence of an evidentiary hearing, however, where the motion is to be resolved on the pleadings, supporting memoranda and other proof submitted, the plaintiff need only prove a *prima facie* case of personal jurisdiction. *Id.* at 60. And the district court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Production Group International, Inc. v. Goldman*, 337 F. Supp.2d 788, 793 (E.D.Va. 2004).

For this Court to have specific personal jurisdiction over a defendant, two requirements must be satisfied. First, the Virginia long arm statute, § 8.01-328.1, *Code of Virginia*, must authorize jurisdiction over the defendant in the factual circumstances presented.   Second, the Due Process Clause of the Constitution must not be offended. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).   This analysis is made easier in Virginia, given that its long arm statute is to be construed as co-extensive with the due process clause. *Consulting Engineers, Corp., supra*, 561 F.3d at 277; *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315, 319, 512 S.E.2d 560, 562 (1999).   Nevertheless, both standards will be discussed *seriatim*.

### A.   This Court Has Specific Personal Jurisdiction Over Leff Under Both the Virginia Long Arm Statute and Due Process Clause.

#### 1.   Long Arm Statute

The relevant portions of Virginia's long arm statute provide that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's: (1) [t]ransacting any business in this Commonwealth... or (4) causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth; ..." § 8.01-328.1(A)(1),(4), *Code of Virginia*.   Where the basis for jurisdiction is transacting business here, Virginia is a single act state.   Thus, only one transaction touching Virginia is required to confer jurisdiction on the courts of the Commonwealth, *Id.*, so long as that contact is "significant" and demonstrates "purposeful activity" in Virginia.   *Production Group International, Inc., supra*, 337 F. Supp.2d at 793.

The first step in the analysis requires the court to determine whether the cause of action asserted "arises from" the acts demonstrating that the defendant transacted business in the state. In this Court, "arising from" is to be broadly construed to include facts "relating to" the claims at issue, even if that relationship is indirect.   *Id.* at 794.[2]

---

[2] *Production Group International, Inc.'s* interpretation of "arising from" is supported by the Virginia Supreme Court's decision in *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315, 512 S.E.2d 560 (1999) which held that "arising from" should be interpreted broadly to "include acts of contract performance unrelated to the alleged breach in the jurisdictional analysis." *Production Group International, Inc., supra*, 377 F. Supp.2d at 795.

In *Production Group International, Inc.*, an employer alleged that a former out of state employee had breached his confidentiality agreement by providing confidential information to a new employer. When personal jurisdiction was challenged, this Court wrestled with whether "arising from" should include all of the employees' Virginia-based contacts during his employment, or be confined to only those specifically linked to the breach of contract claim. *Id.* It concluded it was appropriate for the court to consider <u>all</u> of the employee's employment related contacts with Virginia in determining whether those contacts satisfied the "transacting business" test. In particular, the Court considered the employee's "acceptance of employment with a Virginia-based company…his regular communications with plaintiff's Virginia-based colleagues in the course of performing his employment contract, and … his three trips to plaintiff's Virginia headquarters, also in the course of performing his employment contract." *Id.* at 796.

Here, it is alleged that Leff attended a meeting of AAMCO and Cottman dealers in Richmond, Virginia, as President of AAMCO and Cottman in relation to the Cottman conversion program. (Compl. at ¶ 28). During that meeting he announced that two AAMCO centers in Tidewater, Virginia, would be closed.[3] This followed a statement by Mark Dimuzzio, Cottman's Vice President of Strategic Development, who accompanied Leff to the meeting, to Truskowski a few days before the meeting that Cottman intended to eliminate Dunlap as a dealer and provide the exclusive territory to Truskowski if he converted to an AAMCO center. (*Id.* at ¶s 24-25).

Leff's attendance at this meeting plainly constituted transacting business in the Commonwealth. In addition, the Complaint contains numerous allegations of how Leff, as well

---

[3] Curiously, the defendants omit from discussion in their argument this allegation against Leff, the one that frames the issues in the case.

as Cottman and AAMCO representatives, put the scheme to eliminate Dunlap's centers into effect.  The extent of Leff's other contacts with Cottman or AAMCO dealers in Virginia related to the conversion issue is unknown at this time.  It is known that other Cottman centers existed in Virginia. Under the holding in *Production Group International, Inc.*, all of those contacts may be considered in determining whether Leff was transacting business in Virginia.  Plainly though, these allegations against Leff in conjunction with allegations of conduct by Cottman were significant and purposeful thus, meeting the requirement that Dunlap establish a *prima facie* case for jurisdiction over Leff.

Moreover, it is well established in this court that "specific jurisdiction need not be based exclusively on the actions of the defendant in question," but, "rather...may be based upon acts committed by a co-conspirator." *Galustian v. Peter*, 750 F. Supp.2d, 670, 674 (E.D.Va. 2010), citing *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp.2d, 513, 538-39, (E.D.Va. 2009).  As this Court recounted in *Galustian*, "a defendant who joins a conspiracy knowing that acts in furtherance of the conspiracy have taken or will take place in the forum state . . . has purposely availed himself of the privileges of that state and should reasonably expect to be haled into Court there.'" *Id.*, quoting *Nobel Sec., Inc., supra*, 611 F. Supp.2d at 539.[4]

Other courts concur in this approach.  In *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp.2d 601 (E.D.Va. 2002) the Court explained that a co-conspirator is subject to personal jurisdiction in a forum where substantial acts in furtherance of the conspiracy were performed by any member of the conspiracy if the co-conspirator knew or should have known that the acts

---

[4] Leff argues that even though he was President of ADS, Cottman and AAMCO, companies subject to jurisdiction in Virginia, that alone cannot establish jurisdiction over him (See Motion to Dismiss at 9).  Such an argument ignores that, because Leff conspired with companies subject to jurisdiction in Virginia, and the product of that conspiracy was the torts occurring and having effect in Virginia, he is vicariously subject to personal jurisdiction as a co-conspirator.

would be performed. *Id.* at 622. "Moreover, participation in an alleged conspiracy is sufficient to subject a defendant to personal jurisdiction in a forum even though the defendant's only contact with that forum was through the actions of a co-conspirator. *Noble Sec., Inc., supra,* 611 F. Supp.2d at 539, citing *Gemini Enters., Inc. v. WFMY Television Corp.*, 470 F. Supp. 559, 564 (M.D.N.C. 1979). See also *American Online, Inc. v. Ambro*, 2005 U.S. Dist. LEXIS 46261, at *3 n. 1. (E.D.Va., Sept. 8, 2005) ("sufficient to allege that the defendants in question participated in the conspiracy, and that since they knew, or should have known, that contact with Virginia would result, their participation in the conspiracy was a sufficient basis for the court to assert personal jurisdiction under the Virginia long arm statute.")

Here, Dunlap has alleged that members of the conspiracy involving Leff, Cottman, AAMCO, Truskowski and Biller, committed numerous overt acts either directed to or occurring in Virginia. (See Compl., ¶¶ 74-78). Among others, these included: (1) the conversions of Biller's and Truskowski's Cottman centers into AAMCO centers in Portsmouth and Chesapeake, Virginia; (2) the co-branding of those centers with both Cottman and AAMCO signage; (3) the removal of Dunlap's centers from the Tidewater, Virginia, Verizon Yellow Pages; and (4) the attempt to terminate Dunlap's AAMCO stores located in Portsmouth and Chesapeake, Virginia, in 2006 based upon false pretenses. All those acts were committed in Virginia and were the product of the conspiracy alleged between the defendants and others. Doubtless, Leff, as a co-conspirator and as President of Cottman, knew or should have known that these acts would occur in Virginia, as Dunlap's, Biller's and Truskowski's stores were located here.

Given the myriad allegations of conduct in furtherance of the conspiracy involving Leff, as well as Cottman and AAMCO representatives, all of whom were located in Pennsylvania, that were directed toward Virginia, the requirements of § 8.01-328.1(A)(4), *Code of Virginia*, are also

satisfied.  That section permits jurisdiction over someone who "cause[s] tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth."

Here, as alleged, the scheme to drive Dunlap out of business was put into effect by Dimuzzio, Leff, Cottman and AAMCO, in Pennsylvania where they are all located.  Truskowski and Biller were co-conspirators who participated in Virginia.  There can be no question that both Cottman and AAMCO regularly do business in Virginia and derive substantial revenues from those operations.[5]   And because the activities of co-conspirators are imputed to Leff, the prerequisites of general personal jurisdiction are easily satisfied.

## 2.   **Due Process Clause**

To satisfy the constitutional due process requirements, a plaintiff must demonstrate that the defendant had sufficient "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The Fourth Circuit has adopted a three part test to determine whether that standard has been satisfied.  Under its directive, where specific jurisdiction is challenged, a court must consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2)

---

[5] The total revenues received by Cottman and AAMCO in Virginia is unknown to Dunlap, but, should the Court believe it relevant, Dunlap asks for permission to conduct limited discovery related to the personal jurisdiction issue.

whether the plaintiff's claims arise out of those activities directed at the State[6]; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Engineers Corp., supra,* 561 F.3d at 278. These prongs are considered in order and the analysis only reaches the next level if the previous one is satisfied. *Noble Sec., Inc. supra,* 611 F. Supp.2d at 530.

The "purposeful availment" requirement protects a defendant from being haled into court based upon "random", "fortuitous", or "attenuated" contacts with a State. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299 (1980). In *Burger King,* the Court instructed that "where the defendant 'deliberately' has engaged in significant activities within a State or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Id.* at 475-76. In that case, Rudewicz, a Michigan citizen, "deliberately '[reached] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 476. Accordingly, the Court concluded that "the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" *Id.*

In this instance, there can be no question that Leff voluntarily came into Virginia to speak to both Cottman and AAMCO dealers in 2006 as part of the Cottman conversion program. And it was at that meeting he announced that two of the Tidewater, Virginia AAMCO centers would

---

[6] Under the Supreme Court's test set out in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), this element is even broader. The appropriate test is whether "the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* At 472, quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

have to close.  Within days, Dunlap was notified that his two centers had been chosen for elimination.  No doubt, Leff attended the meeting as President of both companies because there were a number of Cottman and AAMCO dealers throughout Virginia.  The conclusion is inescapable that he purposefully availed himself of the privilege of conducting business activities in this Commonwealth.

The second prong is whether Dunlap's claims arise out of or are related to those activities directed toward Virginia.  This requirement is likewise met because the actions alleged that form the basis of the claims asserted flowed from the announcement of that decision.  Indeed, as alleged, Cottman had already indicated to Truskowski that Dunlap was being eliminated prior to the May 4, 2006 meeting, thus demonstrating that the decision had been made before it was announced by Leff.

Finally, the third element requires the court to determine whether the exercise of personal jurisdiction is constitutionally reasonable.  In doing so, a number of factors have been considered by the courts, including: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Engineers Corp.*, *supra,* 561 F.3d at 279.

Here, there is no appreciable burden on defendants to litigate in Virginia.  Cottman had numerous centers in Virginia at the time the conversion program began.  Virginia has a significant interest in adjudicating the dispute here because Dunlap's businesses were located here and the injury was sustained here.  And Dunlap has a strong interest in being able to obtain cost effective relief locally in the jurisdiction where he lives and his centers are located.

Considering all of these factors, it is constitutionally reasonable to allow this case to proceed against Leff in this forum. And it is the sensible result.

### B.   Under The "Effects Test," The Court May Assert Personal Jursidiction Over Leff.

The "Effects Test" of personal jurisdiction is well established in the Fourth Circuit and in this Court:

> "Under the effects test, the plaintiff 'must establish that specific jurisdiction is proper by showing that (1) the defendant committed an intentional tort; (2) the plaintiffs felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.'" *Consulting Eng'rs Corp., v. Geometric Limited,* 561 F.3d 273, 280 (4th Cir. 2009) (quoting *Carefirst of Md, Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d, 390, 398 n.7 (4th Cir. 2003)).

*Gallustian, supra,* 750 F. Supp. 2d. at 675. Plainly, the co-conspirators, including Leff, directed their tortious acts in furtherance of the conspiracy toward Dunlap in Virginia, where his centers were located. Moreover, Dunlap's Virginia centers suffered the consequences of that tortious activity, as alleged in the Complaint:

> As a direct result of the actions taken by [the co-conspirators], Dunlap has been damaged in that revenue to both his [Virginia AAMCO] centers declined, thus depressing profits and reducing the value of these centers for resale purposes. Ultimately, Dunlap closed the Portsmouth center because of lack of profitability.

(Compl., ¶ 72.)

### IV.   The Intracorporate Immunity Doctrine does not Bar the Claims Asserted against Leff.

Defendants posit that the tort claims against Leff fail, as a matter of law, because they are barred by the intracorporate immunity doctrine. That doctrine, however, does not apply in this instance.

It has long been the rule in Virginia that because a corporation acts only through its agents, officers, and employees, a conspiracy between the corporation and its agents, acting within the scope of their employment is a legal impossibility. *Griffin v. Electrolux Corp.* 454 F. Supp. 29, 32 (E.D.Va. 1979). This principle, known as the intracorporate immunity doctrine, or intracorporate conspiracy doctrine, has a recognized exception, however: if the agent, employee or officer has an "independent personal stake" in the conspiracy, then a conspiracy with the corporation may exist. Although not acknowledged by the defendants, there are a long line of Fourth Circuit cases that have recognized the personal stake exception. See *Greenville Publishing Co. v. Daily Reflector*, 496 F.2d 391 (4th Cir. 1974); *Buschie v. Kirven*, 775 F.2d 1240 (4th Cir. 1985); *Detrick v. Panaplina*, 108 F.3d 529 (4th Cir. 1997); and *American Chiropractic v. Trigon Health Care*, 367 F.3d 212 (4th Cir. 2004). Other district court opinions have followed the Fourth Circuit on the issue. *Selman v. American Sports Underwriters, Inc.*, 697 F.Supp. 225 (W.D.Va. 1988).

Defendants rely heavily upon Judge Cacheris' opinion in *Phoenix Renovation Corp. v. Rodriguez*, 461 F.Supp 411, 429 (E.D.Va. 2006) affirmed, 258 Fed. App'x 526 (4th Cir. 2007) for the proposition that Virginia has not recognized the personal stake exception. They fail to acknowledge, however, that in two subsequent opinions, Judge Cacheris reversed his position on that point. See *Buffalo Wings Factory, Inc. v. Mohd*, 2007 U.S. Dist. LEXIS 91324 (E.D.Va. Dec. 12, 2007) and *The Flexible Benefits Council v. Feltman*, 2008 U.S. Dist. LEXIS 46626 (E.D.Va. June 16, 2008).[7]

---

[7] Curiously, the defendants quote from *Buschie v. Kirven*, *supra*, while failing to recognize that in that opinion, the Fourth Circuit recognized the existence of the personal stake exception.

In the Complaint, Dunlap alleges that "Leff had financial incentives to aggressively pursue the conversion of Cottman centers into AAMCO centers . . . [U]pon information and belief, Leff received additional compensation for each Cottman franchise that converted to an AAMCO center, providing a personal independent stake in the success of the conversion program." (Compl. at ¶ 22). Because of that direct personal economic interest, Leff may legally conspire with Cottman, AAMCO, and others, and may be held legally responsible for his individual conduct.[8]  Accordingly, as a matter of law, the claims against Leff may proceed.

### V.   Leff May Be Personally Liable for Tortious Interference with Contract.

Finally, defendants assert that Leff may not be personally liable for the tortious interference with contract claim, on the basis that as an agent, he may not legally interfere with his principal's contract.  (Defendants' Memorandum at 12).  That broad principle, however, does not apply in this instance.  Defendants are wrong to assert that Leff acted solely as President of AAMCO in interfering with Dunlap's contract with AAMCO.  To the contrary, the allegation is that as President of Cottman, he along with Cottman, acted to interfere with Dunlap's contract with AAMCO as a part of the Cottman conversion program.  In addition, Dunlap alleges that Leff individually profited from every conversion of a Cottman center into an AAMCO center.  And the efforts to prefer Biller and Truskowski, both Cottman dealers, over Dunlap's AAMCO centers in Tidewater, serve as the basis for the claims asserted in the complaint.  Because of Leff's independent personal stake in the outcome, he may be sued individually for his actions.

---

[8] Plaintiff acknowledges that Judge Davis of this Court in *White v. Potacska,* 2008 U.S. Dist. LEXIS 102204 (E.D.Va. Dec. 3, 2008) refused to recognize the personal stake exception.

**VI.** **If Additional Facts Are Necessary to Resolve this Motion, Discovery Should be Permitted.**

Should this Court determine that there are insufficient facts to make out a *prima facie* case for personal jurisdiction over Leff at this time, plaintiff requests that the Court deny this portion of defendants' motion without prejudice and permit discovery to proceed with the directive that the motion may be renewed by Leff at the conclusion of discovery. After all, most of the relevant facts are solely within the possession of the defendants. Fundamental fairness demands no less.

**CONCLUSION**

For all of these reasons, Dunlap respectfully requests that the Motion to Dismiss be denied.

James M. Dunlap
By Counsel

_____/s/_____
W. Michael Holm (Va. Bar No. 21035)
Williams Mullen, P.C.
8300 Greensboro Drive, Suite 1100
McLean, VA  22102
703-760-5200 (phone)
703-748-0244 (fax)
mholm@williamsmullen.com

Stephan E. Anthony (Va. Bar No. 78246)
Williams Mullen, P.C.
999 Waterside Drive, Suite 1700
Norfolk, VA  23510
757-622-3366 (phone)
757-629-0660 (fax)
santhony@williamsmullen.com

## CERTIFICATE OF SERVICE

The Undersigned hereby certifies that on the 15th day of June, 2011, a copy of the foregoing document was filed with the Clerk of the Court via the CM/ECF system, which sent notification to the following parties:

James C. Rubinger (Va. Bar No. 20137)
Benjamin B. Reed (Va. Bar No. 78190)
Plave Koch, PLC
12355 Sunrise Valley Drive, Suite 230
Reston, VA  20191


_____/s/_____
W. Michael Holm (Va. Bar No. 21035)
Williams Mullen, P.C.
8300 Greensboro Drive, Suite 1100
McLean, VA  22102
703-760-5200 (phone)
703-748-0244 (fax)
mholm@williamsmullen.com
Counsel for James M. Dunlap

15231670_2.DOC