UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

JAMES M. DUNLAP,

        Plaintiff,

                                No.  2:11-cv-00272-AWA-LRL

     v.

COTTMAN TRANSMISSION
SYSTEMS, LLC and TODD P.
LEFF,

        Defendants.

**MEMORANDUM IN SUPPORT OF THE DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

James C. Rubinger
Virginia Bar No. 20317
Benjamin B. Reed
Virginia Bar No. 78190
*Counsel for Defendants*
PLAVE KOCH PLC
12005 Sunrise Valley Drive, Suite 200
Reston, VA  20191
Tel: (703) 774-1208
Fax: (703) 774-1201
jrubinger@plavekoch.com
breed@plavekoch.com

# TABLE OF CONTENTS

I.     Preliminary Statement……………………………………………………1

II.    Statement of Undisputed Facts……………………………………………...2

       A.  The Parties…………………………………………………………2

       B.  Dunlap's Allegations In This Case…………………………………...4

       C.  The 2007 Lawsuit…………………………………………………...7

       D.  The 2010 Lawsuit…………………………………………………...8

       E.  The 2011 Lawsuit…………………………………………………...9

III.   Summary Of Argument……………………………………………………11

IV.    Standard Of Review………………………………………………………12

V.     Argument…………………………………………………………………...13

       A.  The Doctrine Of *Res Judicata*, Or Claim Preclusion, Bars
           Dunlap's Claims…………………………………………………...13

       B.  Dunlap Cannot Establish The Elements Of Any Of His Claims……….19

                   1.  Dunlap Cannot Prove Breach Of Contract……………….19

                   2.  Dunlap Cannot Prove Tortious Interference With A
                       Business Expectancy……………………………………...21

                   3.  Dunlap Cannot Prove Damages…………………………22

       C.  The Relationship Among Cottman, Leff, And AAMCO Bars
           Dunlap's Claims…………………………………………………...23

                   1.  Neither Cottman Nor Leff Could Commit
                       Tortious Interference……………………………………...23

                   2.  Neither Cottman Nor Leff Could Conspire
                       With One Another Or With AAMCO……………..........25

VI.    Conclusion…………………………………………………………………28

# I.   <u>PRELIMINARY STATEMENT</u>

The Plaintiff James Dunlap ("Dunlap") was an AAMCO Transmissions franchisee who has spent most of the last decade litigating the terminations of his AAMCO franchise agreements with his franchisor AAMCO Transmissions, Inc. ("AAMCO").  In three prior cases (1) Dunlap agreed to the termination of his two AAMCO Franchise Agreements on dates certain and released claims arising out of the same events he now reasserts; (2) Dunlap agreed to close his Portsmouth Center after AAMCO filed suit when he failed to close it on the agreed-upon date; and (3) AAMCO had to sue yet again when Dunlap refused to close his Chesapeake Center on the agreed-upon date; AAMCO obtained a preliminary injunction, then prevailed in the ensuing arbitration of the merits; and AAMCO subsequently obtained a federal court order converting the preliminary injunction to a permanent injunction, which the court of appeals recently affirmed.

In the most recent proceeding, the federal district judge declared the litigation between the parties to have finally come to an end.  Undeterred by his own prior agreements and release, or by rulings against him by courts and an arbitrator, Dunlap continues to press this case.  Even he appears to understand that he can no longer assert these claims against AAMCO; so, in this case, he is asserting the same claims but against AAMCO's sister company Cottman Transmission Systems, LLC ("Cottman") and the former president and chief executive officer of both companies, as well as their common parent, Todd P. Leff ("Leff").  All of the claims in all of the cases arise from one set of facts and one set of franchise agreements.

The Complaint in this case alleges, that in 2006, when the Cottman and AAMCO systems became commonly owned, the two companies, through Leff, embarked on a "conspiracy" to force Dunlap out of business by terminating Dunlap's AAMCO franchise agreements and having two Cottman franchisees in his markets convert to AAMCO franchises.  Dunlap made identical

allegations against AAMCO in 2007, then *agreed* to permit his two franchise agreements to expire by their terms on dates certain in settlement of that case. He did not comply with his agreement to close his center and litigation was brought to enforce the expiration of his agreements (in both cases, after Leff had left the company). In one case, he capitulated; in the other, he litigated and lost.

Dunlap now seeks to recover from Cottman and Leff for tortious interference with contract and business expectancy, and for violation of the Virginia business conspiracy statute. Dunlap's claims in this case are barred by his prior litigations with AAMCO. His claims also lack any merit. Finally, to establish any of his claims, Dunlap must show that Cottman and Leff were strangers to Dunlap's dealings with AAMCO. But they indisputably are not: AAMCO and Cottman are wholly-owned subsidiaries of the same parent, and Leff was president and CEO of AAMCO, Cottman, and their parent company. The Complaint alleges that the actions about which Dunlap complains were the result of a singular corporate policy, not the interference of outside "intermeddlers."

Summary judgment should be entered in favor of Cottman and Leff on all claims, finally putting an end to Dunlap's litigious ways.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Parties

Dunlap is a former AAMCO franchisee. He operated two AAMCO centers, one in Portsmouth, Virginia (the "Portsmouth Center") and one in Chesapeake, Virginia (the "Chesapeake Center"). (Dkt. No. 1-1, Compl. ¶ 4, 6.) Dunlap entered into an AAMCO franchise agreement on September 26, 1978 governing the operation of the Portsmouth Center (the "Portsmouth Franchise Agreement"), and an AAMCO franchise agreement on June 5, 1981

2

governing the operation of the Chesapeake Center (the "Chesapeake Franchise Agreement").

(*Id.*)  Dunlap operated each of his AAMCO Centers for more than 30 years.  (*Id.* ¶¶ 5-6.)

Copies of the Portsmouth Franchise Agreement and the Chesapeake Franchise Agreement

accompany this Motion as Exhibits 1 and 2.

AAMCO is the franchisor under each of Dunlap's AAMCO Franchise Agreements.

(Exs. 1-2.)  AAMCO is *not* a party to this case.

The defendants in this case are Cottman and Leff.  Cottman and AAMCO are wholly-

owned subsidiaries of American Driveline Systems, Inc. ("ADSI").  (Declaration of Todd P. Leff

("Leff Decl.") ¶ 7; Declaration of James Gregory ("Gregory Decl.") ¶ 3.)  The common

ownership of Cottman and AAMCO came to pass in 2006.  In 2004, American Capital Ltd.

acquired a controlling interest in Cottman through an entity called Cottman Acquisitions, Inc.,

which was the 100% owner of Cottman.  (Leff Decl. ¶ 6.)  In 2006, Cottman Acquisitions, Inc.

changed its name to ADSI and acquired AAMCO.  (*Id.* ¶ 7.)  As a result, ADSI became the

100% owner of both AAMCO and Cottman.  (*Id.*)  AAMCO and Cottman have been wholly-

owned subsidiaries of ADSI at all times since 2006.  (Gregory Decl. ¶ 3.)

The Complaint alleges that both AAMCO and Cottman were less than 100% owned by

ADSI.  (Compl. ¶¶ 9-10.)  That allegation has no basis in fact:  it is not true and never has been.

(Gregory Decl. ¶ 5.)

Leff was the president and CEO of Cottman at the time of its acquisition in 2004, and

became president and CEO of ADSI at that time as well.  (Leff Decl. ¶ 2.)  When ADSI acquired

AAMCO in 2006, Leff became president and CEO of AAMCO as well.  (*Id.*)  He remained

president and CEO of AAMCO, Cottman, and ADSI through April 2009, when he left the

company.  (*Id.* ¶ 7.)

3

B.      **Dunlap's Allegations In This Case**

Dunlap's Complaint in this case arises out of the expiration of his AAMCO Franchise

Agreement.  He claims damages arising out of the defendants' alleged attempts to decrease the

value of his franchises to force him to sell or close his AAMCO franchises.  (Compl. ¶¶ 67-69.)

He has previously litigated the validity of the expiration of his AAMCO Franchise Agreements.

In this case, Dunlap seeks to relitigate the same issues and allegations, but this time against

Cottman and Leff.

The Complaint alleges that after ADSI acquired AAMCO, "Cottman and AAMCO made

a decision to begin a process of converting Cottman centers into AAMCO centers."

(Compl. ¶ 14.)  Dunlap alleges that in furtherance of ADSI's corporate strategy to convert

Cottman centers into AAMCO centers, Cottman, AAMCO, and Leff embarked on a conspiracy

to "eliminate Dunlap from the AAMCO system" (*id.* ¶ 40).  In particular, Dunlap alleges

conspiracy to "falsely declare Dunlap in default of his [AAMCO] franchise agreements"

(*id.* ¶ 82(a); *see also* ¶ 74(b)); to refuse to list his centers in Yellow Pages ads or to allow him to

receive telephone calls to a general number in his market (*id.* ¶¶ 74(c), 82(c)); to provide

preferential treatment and support to two Cottman franchisees, permitting them to co-brand their

centers (*id.* ¶¶ 74(d)-(f), 82(b), (d)); and to fail to enforce certain aspects of AAMCO's contracts

with other franchisees (*id.* ¶¶ 74(f), 82, 90).

The Complaint in this case alleges that shortly after the acquisition of AAMCO, in

March 2006, which resulted in the common ownership of the AAMCO and Cottman systems,

Leff announced the business plan to convert Cottman centers to AAMCO centers where possible.

(*Id.* ¶ 15.)  Thereafter, on March 9, 2006, AAMCO sent a document to AAMCO franchisees

4

announcing the business plan to convert Cottman centers to AAMCO centers where possible. (*Id.* ¶ 18.)

Dunlap further alleges that during a May 4, 2006 meeting of Virginia AAMCO and Cottman dealers, which took place in Richmond, VA, Leff announced the policy to convert as many Cottman centers to AAMCO centers as possible over a three year period. (*Id.* ¶ 28.) Leff allegedly noted that the Tidewater market in which Dunlap was located was saturated, as there were two centers too many. The Complaint alleges that Leff "stated his intent to close two of those centers." (*Id.*)[1]

Dunlap alleges that after the May 4 meeting, ADSI took steps to execute its business plan to convert Cottman centers to AAMCO centers, including acquiring telephone numbers, listing them in telephone directories, and assigning them to the new AAMCO dealers. (Compl. ¶ 30.) The Complaint alleges that in furtherance of that plan, on May 10, 2006, AAMCO and Cottman entered into an amendment to the Cottman License Agreement between Robert Billar and Cottman, which provided for the conversion of Billar's Cottman center in Chesapeake to an AAMCO center. (*Id.* ¶ 31.) And, on May 16, 2006, AAMCO and Cottman also entered into an amendment to Joseph Truskowski's Cottman License Agreement that provided for the conversion of his Cottman center in Portsmouth to an AAMCO center. (*Id.* ¶ 32.) The Complaint alleges that Truskowski decided to convert after being told that Dunlap would be leaving the AAMCO system. (*Id.* ¶¶ 24-25.) The Complaint alleges that Cottman failed to enforce certain provisions of Truskowski's and Billar's Cottman License Agreements in order to

---

[1] The business plan developed by ADSI always anticipated that a certain number of Cottman centers would continue to operate under that brand and compete with AAMCO centers (Leff Decl. ¶ 8); there are still more than 50 Cottman centers in operation today (Gregory Decl. ¶ 6).

5

make it possible for them to convert their Cottman centers to AAMCO centers. (*Id.* ¶¶ 33, 48-52, 54-55, 58-63, 66.)[2]

The Complaint alleges that on May 8, 2006, AAMCO notified Dunlap that he was in default of his AAMCO Franchise Agreements for failure to report sales and pay fees owed to AAMCO. (*Id.* ¶¶ 37-38.) Dunlap had a history of defaults of his Franchise Agreements and had previously been notified of the defaults and provided opportunities to cure. (Leff Decl. ¶ 11.) Dunlap alleges the May 8, 2006 default notices were "[i]n furtherance of Leff's commitment to closing two Tidewater AAMCO centers." (Compl. ¶ 37.) On June 9, 2006, AAMCO notified Dunlap that it was terminating his franchise agreements as a result of his failure to cure his defaults. (*Id.* ¶ 39.) Dunlap alleges that he cured those defaults (*id.* ¶ 38), and that the terminations were "a pretext as AAMCO and Leff had already decided to terminate Dunlap's centers as evidence by the contracts entered into with Truskowski and Billar." (*Id.* ¶ 39.) The Complaint further alleges that Dunlap disputed his defaults and the resulting terminations, and, for a time, he was permitted to continue to operate despite the termination notices. (*Id.* ¶¶ 38-39-41, 43.) AAMCO then ceased providing him with rights and services to which he was believed he was entitled under his Franchise Agreements, including Yellow Pages advertising, technical advice and software support. (*Id.* ¶¶ 42-43.)

---

[2] The Complaint also alleges that Truskowski's converted AAMCO center in Portsmouth was terminated in July 2007. (*Id.* ¶ 64.) The Complaint fails to explain how Truskowski's conversion of his Cottman center to an AAMCO center for such a short period of time could have harmed Dunlap's Portsmouth Center, why Dunlap did not *benefit* from the resulting closure of Truskowski's center in Portsmouth, or how the termination of Truskowski's AAMCO center was consistent with the alleged conspiracy to favor Truskowski over him.

C.     <u>The 2007 Lawsuit</u>

As the Complaint in this case alleges, on January 18, 2007, AAMCO filed a lawsuit

against Dunlap (the "2007 lawsuit"), seeking to enforce the termination of Dunlap's Franchise

Agreements. (Compl. ¶ 44.) *AAMCO Transmissions, Inc. v. Dunlap*, No. 07-0562 (E.D. Pa.

July 17, 2007). But Dunlap fails to disclose that in the 2007 Lawsuit, he asserted counterclaims

against AAMCO for breach of contract and breach of the implied covenant of good faith and fair

dealing, making virtually the same allegations against AAMCO that he now makes against

Cottman and Leff. A copy of Dunlap's Counterclaim accompanies this Motion as Exhibit 3 (No.

07-0562, Dkt. No. 16), and a copy of the Affidavit of James J. Dunlap filed in the 2007 Lawsuit,

which spells out his allegations in greater detail, is Exhibit 4 (No. 07-0562, Dkt. No. 9-3).

Exhibit 19 is a table comparing Dunlap's allegations in this case with his allegations in his

counterclaim in the 2007 Lawsuit.

Specifically, in the 2007 Lawsuit, as in this case, Dunlap alleged that Leff announced a

policy to convert Cottman centers to AAMCO centers, that there were two AAMCO centers too

many in the Tidewater market, and that AAMCO "improperly and without justification targeted

counterclaimant Dunlap's Portsmouth Center and Chesapeake Center for termination as

[AAMCO] franchises." (Ex. 3 ¶ 6.) As in this case, Dunlap alleged that AAMCO "improperly

and without legal right or cause purportedly terminated the franchise agreements effective as of

June 9, 2006." (*Id.* ¶ 9.) He alleged that AAMCO's purported termination of the franchise

agreements "was improper and constitute[d] a material breach of the franchise agreements."

(*Id.* ¶ 10.)

Dunlap further alleged in 2007, as he does now, that sometime in October 2006,

AAMCO ceased providing him with the rights and services he was entitled to under the franchise

agreements, ceased providing him with access to the technical assistance hot line to which he is entitled under the franchise agreements, and wrongfully denied him access to AAMCO advertising, including the placement of Yellow Pages ads.  (*Id.* ¶¶ 13-16.)  Dunlap further alleged, as he does in this case, that AAMCO also improperly allowed a former Cottman center (Truskowski's), located less than a mile from Dunlap's Portsmouth Center, to convert to an AAMCO center.  (*Id.* ¶¶ 17-18.)

The 2007 Lawsuit settled.  Under the Settlement Agreement ("the 2007 Settlement"), AAMCO and Dunlap agreed to reinstate

> the AAMCO franchise agreements . . . for a period not longer than the remaining term of the respective AAMCO franchise agreements (November 29, 2008 for the Portsmouth VA AAMCO center and June 5, 2011 for the Chesapeake, VA AAMCO center) for the limited purpose of permitting Mr. Dunlap to operate the centers so that they can be sold as AAMCO centers to third party purchasers.

A copy of the 2007 Settlement accompanies this Motion as Exhibit 5.  (Goniea Decl. ¶ 8.) AAMCO and Dunlap agreed to mutually release each other from all claims, including all claims asserted in the 2007 lawsuit and agreed to dismiss the 2007 lawsuit with prejudice.  (Ex. 5 ¶ 7.) The district court dismissed the case with prejudice on July 17, 2007.  A copy of the 2007 Order, No. 07-0562, Dkt. No. 28, accompanies this Motion as Exhibit 6.[3]

**D.    The 2010 Lawsuit**

Defendant Leff separated from ADSI, AAMCO, and Cottman in April 2009 and had no further involvement in the operation of the businesses.  (Leff Decl. ¶ 7.)  Dunlap failed to close

---

[3] AAMCO also agreed to indemnify Dunlap if either Truskowski or Billar sued him as a result of the reinstatement of his Franchise Agreements.  (Ex. 5 ¶ 8.)  Neither one did; and Truskowski's converted AAMCO center had been terminated and closed by the time of the settlement. (Compl. ¶ 64.)

his Portsmouth AAMCO center after the Portsmouth Franchise Agreement expired in accordance with its terms and with the 2007 Settlement. (Goniea Decl. ¶ 10.) AAMCO filed suit against Dunlap to enforce the post-term obligations of the Portsmouth Franchise Agreement, and sought a preliminary injunction to require Dunlap to close the Portsmouth Center. *AAMCO Transmissions, Inc. v. Dunlap*, No. 2:10-CV-00611-SD (E.D. Pa. Mar. 26, 2010) (the "2010 Lawsuit"). A copy of the Complaint in the 2010 Lawsuit accompanies this Motion as Exhibit 7. (Goniea Decl. ¶ 10.) That case settled with Dunlap agreeing to close the Portsmouth Center and he did so. (*Id.*)

### E.  The 2011 Lawsuit

Not surprisingly, Dunlap then failed to close his Chesapeake AAMCO center after the Chesapeake Franchise Agreement expired in accordance with its terms and the 2007 Settlement. AAMCO then filed suit to enforce the termination of the Chesapeake Franchise Agreement. *AAMCO Transmissions, Inc. v. Dunlap*, No. 11-4009-BMS, 2011 WL 3586225 (E.D. Pa. Aug. 16, 2011) (the "2011 Lawsuit"). (Goniea Decl. ¶ 11 & Ex. 8.) The district court entered a preliminary injunction in AAMCO's favor, holding that the Chesapeake Franchise Agreement had expired by its terms and in accordance with the 2007 Settlement Agreement (Goniea Decl. ¶ 12 & Ex. 9 (No. 11-4009, Dkt. No. 18) at 9-11), and enjoining Dunlap from continuing to operate the Chesapeake Center. (Ex. 9 at 20.)

The district court also ordered the parties to arbitrate the merits of the dispute. (*Id.*) In the arbitration, Dunlap alleged that AAMCO breached the franchise agreement by asserting that the Franchise Agreement expired in June 2011, in accordance with its terms and the terms of the 2007 settlement. A copy of Dunlap's Demand for Arbitration accompanies this Motion as Exhibit 10. The arbitrator ruled in favor of AAMCO, holding that the Chesapeake Franchise

9

Agreement had expired in June 2011 and that AAMCO had not breached it.  A copy of the Award of Arbitrator (No. 11-4009, Dkt. No. 20-2) accompanies this Motion as Exhibit 11.

AAMCO subsequently filed a Motion to Convert the Preliminary Injunction into a Permanent Injunction and to Exonerate the Injunction Bond.  On July 22, 2015, the district court granted that Motion.  (Ex. 12 (No. 11-4009, Dkt. No. 29).)  In its ruling, the district court began, "[t]he business relationship between AAMCO Transmissions and James M. Dunlap has finally reached a dead end."  (*Id.* at 1).  The district court found that by virtue of the arbitration award in AAMCO's favor and the arbitrator's finding that the Franchise Agreement expired on June 5, 2011, AAMCO had established actual success on the merits of its claim because "Dunlap is precluded from relitigating the date on which the [Chesapeake Franchise] Agreement expired, as the issue was fully and fairly litigated and necessary to the arbitrator's decision."  (*Id.* at 4.)  The district court further found that a permanent injunction would not harm Dunlap because it would "merely prevent Dunlap from engaging in conduct to which he has no legal right."  (*Id.*)  The district court emphasized that "AAMCO has the right to rely on the finality of this Court's rulings, and no later grant of damages or a second injunction would compensate AAMCO for the cost and vexation of having to defend subsequent litigation over issues barred by *res judicata*."  (*Id.* at 6.)

The district court concluded, "[a]fter numerous detours and side trips, it is finally time for this case to exit the docket."  (*Id.*)  The court granted the motion to convert the preliminary injunction to a permanent injunction and to exonerate the injunction bond.  Dunlap appealed the decision. The United States Court of Appeals for the Third Circuit affirmed.  *AAMCO Transmissions, Inc. v. Dunlap*, No. 15-3013, 2016 WL 1275004 (3d Cir. Apr. 1, 2016).  A copy of the Third Circuit's Opinion accompanies this Motion as Exhibit. 13.  The court of appeals

10

held that "AAMCO successfully demonstrated that it had already succeeded on the merits of its claim that the franchise agreement ended in June 2011, and that Dunlap did not dispute that the arbitrator's decision was binding and could not be re-litigated." (*Id.* at 4.)[4]

## III.   SUMMARY OF ARGUMENT

It is time for this case to exit the docket as well.  Dunlap cannot succeed on his claims against Cottman and Leff.  His prior failed attempts to sue AAMCO for breach of contract preclude him from asserting the identical breaches as predicate acts for his claims under the business conspiracy act and for tortious interference.  Because he is barred by the doctrine of *res judicata* from suing AAMCO for those breaches, he cannot assert the same breaches against AAMCO's sister company or its president.  Furthermore, his prior agreement, in settling the 2007 Lawsuit, to terminate his Franchise Agreements on dates certain, together with his renewed agreement to close the Portsmouth Center in settlement of the 2010 Lawsuit and the arbitral and judicial determinations in the 2011 Lawsuit, preclude him from claiming, as he does in this case, that the closing of those two centers interfered with his rights.

Dunlap's failure to establish his claims against AAMCO in prior cases was for good reason.  None of his allegations amount to a breach of any provision of his Franchise Agreements.  In order to prevail in this case, he must establish a breach.  He cannot do so.  Nor

---

[4] Dunlap has also filed at least three additional lawsuits in Virginia state courts against Cottman, Leff, and others.  (Docket attached as Exhibit 14).  In 2008, he sued Cottman, Leff, Billar, and Mark DiMuzio.  *Dunlap v. Cottman Systems LLC*, No. CL08002524-00 (Chesapeake Cir. Ct. Oct. 31, 2009).  In *Dunlap v. Cottman Transmissions, LLC, et al.*, No. CL13006308 (Chesapeake Cir. Ct.), filed in 2013, Dunlap alleged essentially the same claims as in this case, naming Cottman, Leff, Billar, and American Capital, Ltd. as defendants.  In *Dunlap v. Cottman Transmissions, LLC, et al.*, No. CL15-1498 (Norfolk Cir. Ct.), he filed in 2015 essentially the same claims.  He did not prosecute any of these cases.  Copies of the Complaints in those cases are Exhibits 15 and 16.  (Declaration of James C. Rubinger ("Rubinger Decl.") ¶¶ 15-16.)

11

can he prove any damages arising from the expiration of the Franchise Agreements, to which he agreed.

Finally, the legal relationships among AAMCO, Cottman, and Leff bar Dunlap's claims. The conspiracy claim under the business conspiracy statute depends on the existence of a conspiracy between each of the defendants (and others) with AAMCO; there can be no conspiracy to breach the Franchise Agreements without AAMCO's involvement. The tortious interference claims depend on interference with AAMCO's performance of its contracts with Dunlap. But, neither Cottman nor Leff is legally capable of conspiring with AAMCO: Cottman and AAMCO are wholly-owned subsidiaries of the same parent, and Leff was AAMCO's president. And, neither Cottman nor Leff is legally capable of interfering with AAMCO's contracts or business relationships with its franchisees because they are not third parties within the meaning of that term as it is used in the law of tortious interference. Neither was a third-party "intermeddler." Rather they were an affiliate and an officer carrying out a singular corporate policy.

For each of these reasons, the Court should enter summary judgment dismissing Dunlap's claims.

## IV.   <u>STANDARD OF REVIEW</u>

This court has set forth the standards for summary judgment:

> Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48 (1986). Furthermore, only disputes over facts that

12

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered by a court in its determination. *Id.* at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). At that point, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. In doing so, the Court must construe the facts in the light most favorable to the non-moving party, and may not make credibility determinations or weigh the evidence. *Id.* at 255; *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 213 (4th Cir.2007). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted).

*Balas v. Huntington Ingalls Indus., Inc.,* No. 2:11cv347, 2012 WL 149232, at *3 (E.D. Va. Jan. 18, 2012).

## V.     ARGUMENT

### A.     The Doctrine Of *Res Judicata*, Or Claim Preclusion, Bars Dunlap's Claims

Dunlap cannot assert the breaches of his Franchise Agreements that he alleges as predicate acts in this case against the other party to those agreements, AAMCO.  He asserted the identical claims of breach against AAMCO in the 2007 Lawsuit.  In settling that case, he released his claims, and agreed to their dismissal with prejudice.  He cannot re-assert those claims; indeed, in his two subsequent lawsuits with AAMCO, he did not re-assert those claims. He did, however, attempt to litigate the validity of the termination of his Franchise Agreements in those two cases; he settled one by agreeing to the termination and lost the other.  He cannot

now reassert the same claims and the same injuries that he has previously litigated with

AAMCO.

Dunlap's claims are barred under the doctrine of *res judicata*, or claim preclusion. Under

Pennsylvania law:[5]

> Under the doctrine of res judicata, "[a] final valid judgment upon
> the merits by a court of competent jurisdiction bars any future suit
> between the same parties or their privies on the same cause of
> action." *Stevenson v. Silverman*, 417 Pa. 187, 190, 208 A.2d 786,
> 788 (1965), *cert. denied*, 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76
> (1966). . . The purpose of the doctrine of res judicata is "to minimize
> the judicial energy devoted to individual cases, establish certainty
> and respect for court judgments, and protect the party relying on the
> prior adjudication from vexatious litigation." *Lebeau v. Lebeau*, 258
> Pa.Super. 519, 524, 393 A.2d 480, 492 (1978).  Given this purpose,
> the doctrine of res judicata must be liberally construed and applied
> without technical restriction.  *Hochman v. Mortgage Finance Co.*,
> 289 Pa. 260, 137 A. 252 (1927); *see also Bearoff v. Bearoff Bros.*,
> 458 Pa. 494, 500, 327 A.2d 72, 76 (1974).

*Mintz v. Carlton House Partners, Ltd.*, 407 Pa. Super. 464, 474, 595 A.2d 1240, 1245-46 (1991).

The elements of *res judicata* under Pennsylvania law are:

> It is well established that claim preclusion bars the assertion
> of a claim in a subsequent suit that was or could have been asserted
> in an earlier suit if there is "(1) a final judgment on the merits in a
> prior suit involving; (2) the same parties or their privities, and (3) a
> subsequent suit based on the same cause of action." *See Board of
> Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.
> v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992).  The doctrine of claim
> preclusion bars not only claims actually litigated but also claims that
> could have been brought in the prior action. *Id.* ("Claim preclusion,
> formerly referred to as res judicata, gives dispositive effect to a prior

---

[5] Pennsylvania law applies to the preclusive effect of the prior cases because they were all brought in the United States District Court for the Eastern District of Pennsylvania. *Q Int'l Couriers, Inc. v. Smoak*, 441 F.3d 214, 218 (4th Cir. 2006) (preclusive effect of judgment rendered by a federal district court determined by the law of the state where that federal district court sits.).

14

judgment if a particular issue, although not litigated, could have
been raised in the earlier proceeding").

*ProtoComm Corp. v. Novell, Inc.*, No. CIV.A. 94-7774, 1998 WL 351605, at *4 (E.D. Pa. June

30, 1998).

Each of the prior lawsuits satisfies the first element.  The 2007 Lawsuit was settled,

Dunlap released his claims, and his claims were dismissed with prejudice.  Under Pennsylvania

law, a settlement of claims has the same preclusive effect as a litigated judgment.  In *Barson's &*

*Overbrook, Inc. v. Arce Sales Corp.*, 227 Pa. Super. 309, 312, 324, A.2d 467, 468 (1974), the

Court held:

> Parties to an action may compromise a pending legal claim
> by entering into a valid contract of settlement.  Where such an
> agreement accompanies a discontinuance, the claim is forever
> barred and a new action cannot thereon be maintained.  *Sale v.
> Amber et al.*, 335 Pa. 165, 168-169, 6 A. 519 (1939).  In essence the
> entry of an order to settle, discontinue, and end a proceeding has 'the
> same effect as the entry of a judgment' in any legal proceeding.
> *Sustrik v. J. & L. Steel Corp.*, 413 Pa. 324, 326-237, 197 A.2d 44
> (1964). All parties who sign such an order to settle, discontinue and
> end forever renounce their claims arising out of said action.
> *Baumgartner v.  Whinney*, 156 Pa.Super. 167, 39 A.2d 738 (1944),
> as if the matter had been fully litigated.

*See also Zhang v. Se. Fin. Grp., Inc.*, 980 F. Supp. 787, 792 (E.D. Pa. 1997) ("Under

Pennsylvania law, a judgment by confession is a final judgment 'on the merits' which operates as

res judicata to bar a collateral challenge to that judgment or any claim arising out of the same

underlying transaction or nucleus of events.").

The two subsequent cases arising out of Dunlap's failure to comply with the 2007

Settlement underscore the point.  Dunlap failed to close both centers in accordance with the 2007

Settlement and AAMCO was forced to sue.  In the 2010 Lawsuit, AAMCO dismissed the action

when Dunlap agreed to close the Portsmouth Center.  In the 2011 Lawsuit, Dunlap actually

15

litigated his claim of the impropriety of the expiration of the Chesapeake Franchise Agreement. He opposed AAMCO's motion for a preliminary injunction; he arbitrated his claim that the termination constituted a breach, and he opposed AAMCO's motion to convert the preliminary injunction to a permanent injunction.  He lost every step of the way.  He cannot now reassert as he does, that the Chesapeake Franchise Agreement was somehow improperly "terminated."  *See Barson's & Overbrook, Inc., supra*, 227 Pa. Super. at 312, 324 A.2d at 468 (arbitrators' award barred relitigation).

The second element – "same parties or their privities" – is also met in this case. Pennsylvania courts have applied claim preclusion "against a plaintiff who has previously asserted essentially the same claim against different defendants where there is a close or significant relationship between successive defendants." *Gambocz v. Yelencsics*, 468 F.2d 837, 841 (3d Cir. 1972).  Courts have routinely applied claim preclusion to affiliated companies and corporate officers of the original defendant.  *See ProtoComm, supra*, 1998 WL 351603, at *5 (parent company); *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 966 (3d Cir. 1991) (wholly-owned affiliate); *Jackson v. Dow Chem. Co.*, 902 F. Supp. 2d 658, 670-71 (E.D. Pa. 2012) (employees, affiliates, and counsel were in privity with original corporate defendants); *Zhang, supra*, 980 F. Supp. at 794 (officers, employees, and attorneys of corporate defendant); *Greenberg v. Potomac Health Sys., Inc.*, 869 F. Supp. 328, 331 (E.D. Pa. 1994) (subsidiary and shared corporate officers); *Bush v. E. Unif. Co.*, 356 Pa. 298, 300-1, 51 A.2d 731, 732 (1947) (shareholder of defendant corporation).

In this case, the defendants are Cottman, an affiliate of AAMCO, wholly-owned by the same parent ADSI; and Leff, the former president and CEO of Cottman, AAMCO, and ADSI. The 2007 Lawsuit alleges that AAMCO breached Dunlap's AAMCO Franchise Agreements in

16

terminating them, by taking steps to favor Cottman dealers in order to oust him from the

AAMCO system and by depriving him of support to which he was entitled.  The 2007 Lawsuit

further alleges that Leff was involved in developing and implementing the strategy for both

companies.  The 2010 and 2011 Lawsuits litigated the validity of the agreed-upon expirations of

Dunlap's two Franchise Agreements.  Cottman and Leff are indisputably in privity with

AAMCO.

The third element of claim preclusion – identity of the claims – is also satisfied.  As we

have shown, the allegations in 2007 are very similar to those in this case.  *See* pages 8-9 *supra* &

App. 1.  Because the two cases arise out of the same underlying events, they constitute the same

cause of action.  Similarly, the 2010 and 2011 Lawsuits determined the validity of the

termination of Dunlap's Franchise Agreements, which Dunlap seeks to relitigate in this case.

In *Munsif v. Am. Board of Internal Medicine*, No. 11-5949, 2012 WL 3962671, at *12

(E.D. Pa. Sept. 11, 2012), the court explained the rule:

> Whether a lawsuit involves the same cause of action as an earlier suit depends not on the particular legal claims or legal theory asserted, but on the "essential similarity of the underlying events giving rise to the various legal claims." *Lubrizol. . .,* 929 F.2d [at] 963 (quoting *Davis v. U.S. Steel Supply*, 688 F.2d 166, 171 (3d Cir. 1982) (en banc)).  In making this determination, a court should focus on "whether the acts complained of were the same, whether the material facts alleged in each suit were the same, and whether the witnesses and documentation required to prove such allegations were the same." *Id.* (quoting *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 984 (3d Cir. 1984)).  Res judicata operates to bar "not only claims that were brought in the previous action, but also claims that could have been brought." *Elkadrawy v. Vanguard Grp., Inc.,* 584 F.3d 169, 173 (3d Cir. 2009) (quoting *Post v. Hartford Ins. Co.,* 501 F.3d 154, 169 (3d Cir. 2007)).  Thus, the fact that a later-filed suit includes new allegations will not prevent preclusion where the allegations involve issues "fundamentally similar" to those raised in the earlier action. *See id.* at 173-74.

17

The allegations of the current Complaint differ from the 2007 counterclaim only in that the current Complaint alleges the facts in greater detail and alleges a few immaterial facts that took place after the 2007 Lawsuit.  These allegations are primarily that the acts Dunlap alleged in the 2007 Lawsuit continued:  Truskowski's continued use of both Cottman and AAMCO phone numbers (Compl. ¶ 64), failure to provide Yellow Pages ads (*id.* ¶ 56), and animosity toward Dunlap (*id.* ¶¶ 56-72).  These added allegations do not change the nature of Dunlap's claims; they are merely additional pieces of evidence that purportedly support them.

The court in *Jackson v. Dow Chemical Co.*, rejected the argument that the addition of factual allegations in a second lawsuit, even those subsequent to those in the first lawsuit, create a different cause of action:

> Plaintiff argues that these claims are not identical because they rely in part on conduct that allegedly occurred after the filing of the CAC on June 11, 2008.
>
> But plaintiff's addition of some new facts cannot obscure the "essential similarity of the underlying events giving rise to the various legal claims." *Davis v. U.S. Steel Supply*, 688 F.2d 166, 171 (3d Cir. 1982) (en banc); *see also United States v. Athlone Indus., Inc.*, 746 F.2d 977, 984 (3d Cir. 1984).  Plaintiff has, at best, sprinkled some more recent factual allegations into his essentially unchanged narrative.  Plaintiff has not altered the material facts of the claims or his theory of recovery.  I have no difficulty concluding that these claims are precluded.

902 F. Supp. 2d at 672 (footnote omitted).  This holding is precisely the correct result in this case -- the underlying events of the two cases are "essentially similar."  *Id.* at 674.  The Court in this case, like the *Jackson* court should "have no difficulty concluding these claims are precluded."  *Id.* at 672.  *See also Lubrizol*, 929 F.2d at 963 ("essential similarity of the underlying events giving rise to the various legal claims" precluded second action, even though new legal theories were raised in the second).

\*      \*      \*

The prior claims asserted by Dunlap against AAMCO bar the claims in this case.  They arise out of the same events and transactions as he alleged in the 2007 Lawsuit, in which Dunlap alleged that his AAMCO Franchise Agreements had been wrongfully terminated and agreed to the expirations of the Franchise Agreements.  The 2010 and 2011 Lawsuits resolved that Dunlap's Franchise Agreements expired in accordance with their terms and the terms of the 2007 Settlement.  Dunlap cannot relitigate these issues, as he seeks to do in this case.

**B.**     **Dunlap Cannot Establish The Elements Of Any Of His Claims**

An additional basis for entering summary judgment for the defendant is that Dunlap cannot establish the elements of any of his claims.  He cannot show breach of contract, which is an element of two of his claims.  He cannot show interference with a business expectancy, an element of his third claim.  And he cannot prove damages.

**1.**     **Dunlap Cannot Prove Breach Of Contract**

Dunlap's claim of tortious interference with a contract requires proof of breach.  *Chaves v. Johnson*, 230 Va. 112, 121, 335 S.E.2d 97, 103 (1985).  His claim for violation of the Virginia business conspiracy statute, in turn, requires proof of tortious interference.  *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215, 754 S.E.2d 313, 317 (2014) ("'claim of civil conspiracy generally requires proof that the underlying tort was committed.'" (quoting *Almy v. Grisham*, 273 Va. 68, 80, 639 S.E.2d 182, 188 (2007))).

But Dunlap cannot show breach of contract.  In addition to his failed prior attempts to establish those claims against AAMCO, Dunlap has not alleged the breach of <u>any</u> provision of his AAMCO Franchise Agreements.  It is no accident that Dunlap cites no provisions of his Franchise Agreements in his Complaint, and does not attach them to his Complaint.  There is no

19

provision of either of his Franchise Agreements that was breached by any of the conduct he alleges.

None of the wrongdoing Dunlap alleges amounts to a breach of contract.  In particular:

- There is nothing in the Franchise Agreements that precluded AAMCO from ending the franchise relationship when the Franchise Agreements expired.  In the 2007 Settlement Agreement, Dunlap agreed to the expiration dates of the Franchise Agreements. AAMCO's terminations of the two Franchise Agreements on the dates to which Dunlap agreed are consistent with and pursuant to AAMCO's contractual rights, not a breach of them.  And, Dunlap agreed a second time to close the Portsmouth Center, in the 2010 Lawsuit, and, in the 2011 Lawsuit, lost his claim that AAMCO's enforcement of the expiration of the Chesapeake Franchise Agreement constituted a breach.

- Neither Franchise Agreement afforded Dunlap an exclusive right to operate AAMCO centers in a defined territory (Ex. 1 § 1; Ex. 2 §§ 1.1 - 1.3), so his allegations about the conversion of Truskowski's and Billar's centers in "his territories" (Compl. ¶ 82(a)) do not amount to a breach.

- Neither Franchise Agreement granted Dunlap the right to insist that AAMCO strictly enforce the terms of its franchise agreement with other franchisees, so his allegations that AAMCO failed to do so do not amount to a breach.

- Neither Franchise Agreement precluded AAMCO from assisting other franchisees as it saw fit, including assisting them to convert their non-AAMCO centers to AAMCO centers, so his allegations of support for Truskowski and Billar do not amount to a breach.

- Neither Franchise Agreement precluded AAMCO from co-branding in any way, including the use of marks or telephone numbers, so his allegations that AAMCO permitted

20

Truskowski and Billar to retain Cottman telephone numbers while operating AAMCO centers do not amount to a breach.

- Neither Franchise Agreements required AAMCO to provide Yellow Pages advertising to Dunlap, so his allegations that he was deprived of Yellow Pages ads do not amount to a breach.

## 2.    Dunlap Cannot Prove Tortious Interference With A Business Expectancy

Although Dunlap's claim for tortious interference with a business expectancy does not require a showing of breach of contract, Dunlap cannot succeed on that claim either.  As a Virginia federal court has held, "contact by the defendant with the source of the plaintiff's business expectancy, direct or indirect, is a de facto prima facie element of a claim for tortious interference with a business expectancy." *17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 601 (E.D. Va. 2005).  Dunlap alleges that Cottman and Leff interfered with Dunlap's business expectancy with his consumers, claiming it is reasonably probable that "had the defendants not taken these actions, Dunlap's centers would have serviced a larger volume of customers and been more profitable." (Compl. ¶ 92.)  But there is no allegation of any "contact" between either Cottman or Leff with Dunlap's customers.

Furthermore, Dunlap had no "expectancy" to operate an AAMCO center in the absence of a franchise agreement with AAMCO.  Dunlap's loss of customers resulted from the expiration of Dunlap's Franchise Agreements – to which he agreed.  Dunlap had no objective expectancy that he could continue to operate his AAMCO centers beyond the terms of his agreements.  So, he can have no claim for interference with that expectancy. *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301, 484 S.E.2d 892, 897 (1997).

21

### 3.   **Dunlap Cannot Prove Damages**

Dunlap has no basis on which to prove damages.  The amount of damages must be

proven with "reasonable certainty." *SunTrust Bank v. Farrar*, 277 Va. 546, 554, 675 S.E.2d 187,

191 (2009).  The plaintiff does not meet its burden if the damages alleged are "derived from

uncertainties, contingencies, or speculation." *Id.*  Summary judgment dismissing a claim is

appropriate when "the plaintiff fails 'to establish damages with reasonable certainty.'" *Bernsen*

*v. Innovative Legal Mktg., LLC*, No. 2:11cv546, 2012 WL 3912759, at *2 (E.D. Va. Sept. 6,

2012) (quoting *Isle of Wight County v. Nogiec*, 704 S.E.2d 83, 86 (Va. 2011)).

Dunlap claims to be entitled to "lost profits, lower business and personal income, and

other lowered benefits from both shops, and loss from forced sales of Portsmouth inventory

stock." (Rubinger Decl. ¶ 5 & Ex. 17 at 13.)  It is not at all apparent how Dunlap proposes to

prove any of these alleged damages.  First, these items are all inherently speculative -- they all

depend on analyses of what Dunlap would have earned if the alleged wrongdoing had not

occurred.  Dunlap's Franchise Agreements expired according to their terms and the terms of the

2007 Settlement.  There can be no damages arising out of their termination; but any calculation

of lost profits after termination requires analysis of Dunlap's financial documents, market

conditions, and an array of other factors.  Similarly, calculation of lost profits prior to

termination requires an analysis of the many reasons for Dunlap's alleged loss of customers.

Dunlap has not provided any basis for the calculation of these damages.

Indeed, Dunlap concedes that "[u]ntil discovery is completed . . . Dunlap cannot provide

specific income loss calculations or shop valuations for his damages claims." (Ex. 17 at 13.)

But Dunlap has not served any discovery requests seeking discovery on these issues (or any

requests at all, for that matter). (Rubinger Decl. ¶ 7.)  It is now too late for Dunlap to serve

discovery requests under the Court's scheduling order.  So, by his own admission, he cannot calculate damages.

Finally, Dunlap's theories call for expert testimony.  Dunlap designated an expert to testify about damages.  (*Id.* ¶ 8 & Ex. 18.)  But, Dunlap did not serve a report or any supporting materials, as required by Fed. R. Civ. P. 26(a)(2)(B) and the Court's Scheduling Order, prior to the May 9, 2016 deadline, which was extended from the initial April 7, 2016 deadline.  (Dkt. No. 51; Rubinger Decl. ¶ 9.)  Dunlap is therefore barred from presenting expert testimony on the issue of damages (or, for that matter, on any issue).

Dunlap's inability to present any evidence to support any calculation of his claimed damages with reasonable certainty provides an additional basis for the entry of summary judgment for the defendants.

## C.      The Relationship Among Cottman, Leff, And AAMCO Bars Dunlap's Claims

A final basis for the entry of summary judgment is that all of Dunlap's claims require wrongdoing by third parties to his relationship with AAMCO.  But, at all relevant times, Cottman was wholly-owned by ADSI, which also was the 100% owner of AAMCO; and Leff was the president and CEO of AAMCO, Cottman, and ADSI.  The Complaint alleges that Dunlap's injuries were caused by the implementation of a corporate policy by all of them.  There can be no conspiracy between or among Cottman, Leff, and AAMCO, and neither Cottman nor Leff is legally capable of interfering with AAMCO's contracts or business relationships.

### 1.      Neither Cottman Nor Leff Could Commit Tortious Interference

Under Virginia law, tortious interference can only be committed by a non-party to the contract or business expectancy.  *Chaves v. Johnson*, 230 Va. at 120, 335 S.E.2d at 102.  The Virginia Supreme Court has held that an agent acting within the scope of his or her employment

cannot interfere with the contract of the principal. *Fox v. Deese*, 234 Va. 412, 427, 362 S.E.2d 699, 707-08 (1987).

Applying *Fox*, Virginia courts have held "if an employee is acting within the scope of his employment, he is acting as an agent of his employer, and cannot be labeled as 'an interferer or third party.'" *Hiers v. Cave Hill Corp.*, 51 Va. Cir. 208, 212, 2000 WL 145359, at *4 (Va. Cir. Ct. Jan. 6, 2000). In *Haigh v. Matsushita Elec. Corp.*, 676 F. Supp. 1332, 1349 (E.D. Va. 1987), Judge Spencer granted the defendants' motion for summary judgment dismissing a claim that a Panasonic employee tortiously interfered with another employment contract, holding that the alleged scheme was "devised by Panasonic officials to further Panasonic's interests." Similarly, in *Livia Props., LLC v. Jones Lang LaSalle Americas, LLC*, No. 5:14–00053, 2015 WL 4711585, at *6-7 (W.D. Va. Aug. 7, 2015), the district court dismissed a claim that a leasing agent tortiously interfered with contracts between its principal and the plaintiff, holding that the acts alleged "were taken in furtherance of its work on [the principal's] behalf and, therefore, the claim for tortious interference fails." *See also Atta v. Nelson*, No. 7:11–cv–00463, 2012 WL 178355, at * 4 (W.D. Va. Jan. 23, 2012) (chairman of medical group could not be liable for interfering with group's contract with doctor because he was "carrying out responsibilities imposed by the Board. . . . [and] was not acting as an officious, third-party intermeddler in [the doctor's] contract.").

Virginia courts have also applied the *Fox* rule to refuse to hold corporate affiliates liable for tortiously interfering with one another's contracts or business expectancies. *Kancor Americas, Inc. v. ATC Ingredients*, No. 1:15-cv00589-GBL-IDD, 2016 WL 740061, at *16 (E.D. Va. Feb. 25, 2016) (subsidiary could not interfere with the contract of its parent).

24

In this case, there is no allegation of an "officious, third-party intermeddler."  Rather, the

Complaint alleges that Cottman, AAMCO, and Leff developed and executed a plan to convert

Cottman centers to AAMCO centers; that they permitted Truskowski and Billar to convert their

Cottman centers to AAMCO centers, and assisted them to do so; and that Dunlap closed his two

AAMCO centers as a result of that plan.  (*See* Compl. ¶¶ 14, 28, 37, 40).  There is no allegation

in the Complaint that either Cottman or Leff engaged in any conduct that was not in furtherance

of this common corporate policy.  Accordingly, there can be no tortious interference.

### 2.    Neither Cottman Nor Leff Could Conspire With One Another Or With AAMCO.

In order to state a claim for conspiracy under Virginia Code Sections 18.2-499 and 18.2-

500, the plaintiff must allege that at least two people conspired.  *CaterCorp, Inc. v. Catering*

*Concepts, Inc.*, 246 Va. 22, 28, 431 S.E.2d 277, 282 (1993). But, under Virginia law, a

corporation cannot conspire with its agents, and that is what Dunlap has alleged in this case.  As

the Fourth Circuit held, "[t]he law is well-settled . . . that a conspiracy between a corporation and

its agents, acting within the scope of their employment, is a legal impossibility." *Marmott v. Md.*

*Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986).  This doctrine, known as the "intracorporate

immunity doctrine," has been employed repeatedly to defeat claims of conspiracies between

corporations and their agents under Virginia Code §§ 18.2-499 and 18.2-500.  *See, e.g., Heirs*, 51

Va. Cir. at 212, 2000 WL 144359, at *4 (holding that under the intracorporate immunity

doctrine, "there cannot be a valid claim where it is alleged that an employee or agent of the

corporation is alleged to have conspired with the corporation") (citing *Fox v. Deese*, 234 Va.

412, 328, 362 S.E.2d 699, 708 (1987)); *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593,

616 (E.D. Va. 2005) (granting motion to dismiss and holding that "an entity can neither conspire

nor combine with an agent under Virginia law" because "[t]he doctrine of intracorporate immunity, . . . recognizes that . . . because a corporation and its agents comprise a single legal entity, they are legally incapable of conspiracy"); *Mich. Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000) ("Generally, an agent cannot conspire with its principal"); *Lewin v. Cooke*, 95 F. Supp. 2d 513, 524-25 (E.D. Va. 2000) (holding that "[t]he doctrine of intracorporate immunity recognizes that . . . because a corporation and its agents comprise a single legal entity, they are legally incapable of conspiracy" and that "an alleged conspiracy between an employer and its employees acting within the scope of their employment, is a 'conspiracy of one, a legal impossibility'" (quoting *Douty v. Irwin Mortg. Corp.*, 70 F. Supp. 2d 626, 632 (E.D.Va. 1999))).

Similarly, wholly-owned subsidiaries of the same parent cannot conspire with one another. The Fourth Circuit announced this rule in 1990 in the context of the federal antitrust law. *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 146 (4th Cir. 1990) ("two subsidiaries wholly owned by the same parent corporation are legally incapable of conspiring with one another for purposes of § 1 of the Sherman Act"). Both the Fourth Circuit and Virginia state courts have applied this rule to state law conspiracy claims, including claims under the business conspiracy statute. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 220 n.9 (4th Cir. 2004); *Scott & Stringfellow, LLC v. AIG Commercial Equip. Fin., Inc.*, No. 3:10CV825-HEH, 2011 WL 1348324, at *5-6 (E.D. Va. Apr. 8, 2011) (applying intracorporate immunity analysis to Virginia business conspiracy claim).

Dunlap appears to attempt to circumvent the intracorporate immunity doctrine by alleging that Cottman and Leff each benefitted from the alleged wrongdoing. (Compl. ¶¶ 76, 85.) This allegation is neither relevant nor true. Virginia courts have refused to recognize this so

26

called "personal stake" exception to the corporate immunity doctrine. *Phoenix Renovation Corp.
v. Rodriguez*, 461 F. Supp. 2d 411, 429 (E.D. Va. 2006) ("Virginia has not recognized the so-
called 'personal stake' exception to [the intracorporate immunity doctrine] when the conspiring
agent has an independent personal stake in achieving the conspiracy's illegal objective."), *aff'd*,
258 F. App'x 526 (4th Cir. 2007); *Hiers*, 51 Va. Cir. at 212, 2000 WL 145359, at *4 ("[a]lthough
the Virginia Supreme Court has adopted the intracorporate immunity doctrine, it has not adopted
[the personal stake] exception to this doctrine."); *Vollette v. Watson*, 937 F. Supp. 2d 706, 727
(E.D. Va. 2013) (noting the independent personal stake exception was not adopted by Virginia
courts under a common law conspiracy claim).

The "personal stake" allegations in this case also have no factual basis.  Contrary to
Dunlap's allegation (made "on information and belief") (Compl. ¶ 22), Leff was *never*
compensated on the basis of the number of Cottman centers converted to AAMCO centers.  (Leff
Decl. ¶ 12.)  Cottman received a small portion of the fees paid by Cottman franchisees as
compensation for the lost royalty stream paid to Cottman by departing Cottman franchisees, but
Cottman ended up with *less* revenue as a result of each conversion than it would have realized if
the franchisee remained in the Cottman system.  (*Id.*)

Finally, the Fourth Circuit's earlier decision in this case does not alter the analysis.
*Dunlap v. Cottman Transmissions Sys., LLC*, 576 F. App'x 225 (Mem), 2014 WL 2854782 (4th
Cir. June 24, 2014)  The court had before it a motion to dismiss, and had to accept the allegations
of the Complaint, which erroneously alleges that AAMCO and Cottman were not wholly-owned
subsidiaries of ADSI (Compl. ¶¶ 9-10, 12); on summary judgment, however, the court must
apply the undisputed evidence that both entities were and are wholly-owned subsidiaries of the

same company.  The undisputed facts show that the defendants are entitled to the benefit of the intracorporate immunity doctrine.

The Fourth Circuit also, *in dicta*, observed that because the Complaint alleged the involvement of other conspirators, Truskowski and Billar, there was no intracorporate immunity. 576 F. App'x at 227, 2014 WL 2854782, at *2.  On summary judgment, the allegations of the Complaint must give way to evidence, and it is Dunlap's burden to come forward with evidence that Truskowski and Billar were conspirators rather than beneficiaries of the business plan to convert Cottman centers to AAMCO centers.  (Leff Decl. ¶ 9.)  Moreover, because none of the alleged wrongdoing could possibly have occurred without AAMCO's participation, AAMCO was the hub of the alleged "conspiracy."  It is AAMCO that terminated Dunlap's Franchise Agreements, it is AAMCO that controlled the Yellow Pages ads and telephone listings, it is AAMCO that did or did not provide services to Dunlap, and it is AAMCO that determined to accept Truskowski and Billar as franchisees.  AAMCO was a necessary party to any alleged "conspiracy."  Because all the alleged "wrongdoing" had to flow through AAMCO, any conspiracy among AAMCO, Cottman, and Leff cannot be actionable as a matter of law.

## VI.   CONCLUSION

Dunlap's decade-long attempts to litigate, re-litigate, and re-litigate again his grievances with AAMCO must come to an end.  He has had every opportunity to demonstrate that his claims have merit; he has repeatedly failed to do so.  He cannot now assert the same failed claims against AAMCO's affiliate and former president and CEO.

Furthermore, his claims have no merit.  He cannot establish any of them.  He cannot prove damages.

28

Finally, his claims, which are fundamentally breach of contract claims against AAMCO, cannot now be asserted against AAMCO's affiliate and former president and CEO.  Neither of the defendants is legally capable of either conspiring with AAMCO or interfering with AAMCO's contracts.

Accordingly, summary judgment must be entered dismissing these claims, once and for all, with prejudice.

Respectfully submitted,

_____/s/_____

James C. Rubinger
Virginia Bar No. 20317
Benjamin B. Reed
Virginia Bar No. 78190
*Counsel for Defendants*
PLAVE KOCH PLC
12005 Sunrise Valley Drive, Suite 200
Reston, VA  20191
Tel: (703) 774-1208
Fax: (703) 774-1201
jrubinger@plavekoch.com
breed@plavekoch.com

June 2, 2016